33 Cal.Rptr.3d 61 (2005)
37 Cal.4th 130
117 P.3d 673
K.M., Plaintiff and Appellant,
v.
E.G., Defendant and Respondent.
No. S125643.
Supreme Court of California.
August 22, 2005.
*62 Hersh Family Law Practice, Jill Hersh, Jenny Wald and Stephanie Wald, San Francisco, for Plaintiff and Appellant.
Shannon Minter, Courtney Joslin, San Francisco; Jennifer C. Pizer and Amber Garza for Children of Lesbians and Gays Everywhere, Equality California, Family Matters, Family Pride Coalition, Growing Generations, Lambda Legal Defense and Education Fund, the National Center for Lesbian Rights, Our Family Coalition, the Pop Luck Club and Southern California Assisted Reproduction Attorneys as Amici Curiae on behalf of Plaintiff and Appellant.
Debra Back Marley and Robert C. Fellmeth for Children's Advocacy Institute as Amicus Curiae on behalf of Plaintiff and Appellant.
ACLU Foundation of Southern California, Clare Pastore, Christine Sun, San Francisco; ACLU Foundation of Northern California, Alan Schlosser, San Francisco; ACLU Foundation of San Diego and Imperial Counties, Jordan Budd, Elvira Cacciavillani; ACLU Foundation Lesbian and Gay Rights Project and James Esseks for the American Civil Liberties Union of Southern California, the American Civil *63 Liberties Union of Northern California, the American Civil Liberties Union of San Diego and Imperial Counties and the American Civil Liberties Union as Amici Curiae on behalf of Plaintiff and Appellant.
Maxie Rheinheimer Stephens & Vrevich, Darin L. Wessel, Los Angeles; Laura J. Maechtlen, Sacramento; and Vanessa H. Eisemann, Pasadena, for Tom Homann Law Association, Bay Area Lawyers for Individual Freedom, Lesbian and Gay Lawyers Association of Los Angeles, and Sacramento Lawyers for the Equality of Gays and Lesbians as Amici Curiae on behalf of Plaintiff and Appellant.
Alice Bussiere for The Center for Children's Rights at Whittier Law School, The Legal Aid Foundation of Los Angeles, The National Center for Youth Law, The Youth Law Center and Joan Heifetz Hollinger and the Children's Advocacy Project, Boalt Hall as Amici Curiae on behalf of Plaintiff and Appellant.
Sideman & Bancroft and Diana E. Richmond, San Francisco, for Defendant and Respondent.
Liberty Counsel, Mathew D. Staver, Rena M. Lindevaldsen and Mary E. McAlister, San Luis Obispo, for Kristina Sica as Amicus Curiae on behalf of Defendant and Respondent.
Marvin R. Ventrell; Donna Wickham Furth, San Francisco; Wilke, Fleury, Hoffelt, Gould & Birney and William A. Gould, Jr., Sacramento, for Northern California Association of Counsel for Children, National Association of Counsel for Children and The California Psychological Association as Amici Curiae on behalf of Minors.
Geragos & Geragos, Gregory R. Ellis, San Francisco; and Rebekah A. Frye for The Los Angeles County Bar Association, The San Fernando Valley Bar Association and its Family Law Center, The Family Law Section of the Beverly Hills Bar Association, The Bar Association of San Francisco, The Association of Certified Law Specialists and Women Lawyers Association of Los Angeles as Amici Curiae on behalf of Minors.
Morrison & Foerster, Ruth N. Borenstein and Johnathan E. Mansfield, San Francisco, for California NOW, Inc., and California Women's Law Center as Amici Curiae.
MORENO, J.
We granted review in this case, as well as in Elisa B. v. Superior Court (Aug. 22, 2005, S125912) ___ Cal.4th ___, 33 Cal.Rptr.3d 46, 117 P.3d 660, 2005 WL 2000864, and Kristine H. v. Lisa R. (Aug. 22, 2005, S126945) ___ Cal.4th ___, 33 Cal.Rptr.3d 81, 117 P.3d 690, 2005 WL 2000908, to consider the parental rights and obligations, if any, of a woman with regard to a child born to her partner in a lesbian relationship.
In the present case, we must decide whether a woman who provided ova to her lesbian partner so that the partner could bear children by means of in vitro fertilization is a parent of those children. For the reasons that follow, we conclude that Family Code section 7613, subdivision (b), which provides that a man is not a father if he provides semen to a physician to inseminate a woman who is not his wife, does not apply when a woman provides her ova to impregnate her partner in a lesbian relationship in order to produce children who will be raised in their joint home. Accordingly, when partners in a lesbian relationship decide to produce children in this manner, both the woman who provides her ova and her partner who bears the children are the children's parents.

FACTS
On March 6, 2001, petitioner K.M.[1] filed a petition to establish a parental relationship *64 with twin five-year-old girls born to respondent E.G., her former lesbian partner. K.M. alleged that she "is the biological parent of the minor children" because "[s]he donated her egg to respondent, the gestational mother of the children." E.G. moved to dismiss the petition on the grounds that, although K.M. and E.G. "were lesbian partners who lived together until this action was filed," K.M. "explicitly donated her ovum under a clear written agreement by which she relinquished any claim to offspring born of her donation."
On April 18, 2001, K.M. filed a motion for custody of and visitation with the twins.
A hearing was held at which E.G. testified that she first considered raising a child before she met K.M., at a time when she did not have a partner. She met K.M. in October, 1992 and they became romantically involved in June 1993. E.G. told K.M. that she planned to adopt a baby as a single mother. E.G. applied for adoption in November, 1993. K.M. and E.G. began living together in March, 1994 and registered as domestic partners in San Francisco.
E.G. visited several fertility clinics in March, 1993 to inquire about artificial insemination and she attempted artificial insemination, without success, on 13 occasions from July, 1993 through November, 1994. K.M. accompanied her to most of these appointments. K.M. testified that she and E.G. planned to raise the child together, while E.G. insisted that, although K.M. was very supportive, E.G. made it clear that her intention was to become "a single parent."
In December, 1994, E.G. consulted with Dr. Mary Martin at the fertility practice of the University of California at San Francisco Medical Center (UCSF). E.G.'s first attempts at in vitro fertilization failed because she was unable to produce sufficient ova. In January, 1995, Dr. Martin suggested using K.M.'s ova. E.G. then asked K.M. to donate her ova, explaining that she would accept the ova only if K.M. "would really be a donor" and E.G. would "be the mother of any child," adding that she would not even consider permitting K.M. to adopt the child "for at least five years until [she] felt the relationship was stable and would endure." E.G. told K.M. that she "had seen too many lesbian relationships end quickly, and [she] did not want to be in a custody battle." E.G. and K.M. agreed they would not tell anyone that K.M. was the ova donor.
K.M. acknowledged that she agreed not to disclose to anyone that she was the ova donor, but insisted that she only agreed to provide her ova because she and E.G. had agreed to raise the child together. K.M. and E.G. selected the sperm donor together. K.M. denied that E.G. had said she wanted to be a single parent and insisted that she would not have donated her ova had she known E.G. intended to be the sole parent.
On March 8, 1995, K.M. signed a four-page form on UCSF letterhead entitled "Consent Form for Ovum Donor (Known)." The form states that K.M. agrees "to have eggs taken from my ovaries, in order that they may be donated to another woman." After explaining the medical procedures involved, the form states on the third page: "It is understood that I waive any right and relinquish any claim to the donated eggs or any pregnancy *65 or offspring that might result from them. I agree that the recipient may regard the donated eggs and any offspring resulting therefrom as her own children." The following appears on page 4 of the form, above K.M.'s signature and the signature of a witness: "I specifically disclaim and waive any right in or any child that may be conceived as a result of the use of any ovum or egg of mine, and I agree not to attempt to discover the identity of the recipient thereof." E.G. signed a form entitled "Consent Form for Ovum Recipient" that stated, in part: "I acknowledge that the child or children produced by the IVF procedure is and shall be my own legitimate child or children and the heir or heirs of my body with all rights and privileges accompanying such status."
E.G. testified she received these two forms in a letter from UCSF dated February 2, 1995, and discussed the consent forms with K.M. during February and March. E.G. stated she would not have accepted K.M.'s ova if K.M. had not signed the consent form, because E.G. wanted to have a child on her own and believed the consent form "protected" her in this regard.
K.M. testified to the contrary that she first saw the ovum donation consent form 10 minutes before she signed it on March 8, 1995. K.M. admitted reading the form, but thought parts of the form were "odd" and did not pertain to her, such as the part stating that the donor promised not to discover the identity of the recipient. She did not intend to relinquish her rights and only signed the form so that "we could have children." Despite having signed the form, K.M. "thought [she] was going to be a parent."
Ova were withdrawn from K.M. on April 11, 1995, and embryos were implanted in E.G. on April 13, 1995. K.M. and E.G. told K. M's father about the resulting pregnancy by announcing that he was going to be a grandfather. The twins were born on December 7, 1995. The twins' birth certificates listed E.G. as their mother and did not reflect a father's name. As they had agreed, neither E.G. nor K.M. told anyone K.M. had donated the ova, including their friends, family and the twins' pediatrician. Soon after the twins were born, E.G. asked K.M. to marry her, and on Christmas Day, the couple exchanged rings.
Within a month of their birth, E.G. added the twins to her health insurance policy, named them as her beneficiary for all employment benefits, and increased her life insurance with the twins as the beneficiary. K.M. did not do the same.
E.G. referred to her mother, as well as K.M.'s parents, as the twins' grandparents and referred to K.M.'s sister and brother as the twins' aunt and uncle, and K.M.'s nieces as their cousins. Two school forms listed both K.M. and respondent as the twins' parents. The children's nanny testified that both K.M. and E.G. "were the babies' mother."
The relationship between K.M. and E.G. ended in March, 2001 and K.M. filed the present action. In September, 2001, E.G. and the twins moved to Massachusetts to live with E.G.'s mother.
The superior court granted the motion to dismiss finding, in a statement of decision, "that [K.M.] . . . knowingly, voluntarily and intelligently executed the ovum donor form, thereby acknowledging her understanding that, by the donation of her ova, she was relinquishing and waiving all rights to claim legal parentage of any children who might result from the in vitro fertilization and implantation of her ova in a recipient (in this case, a known recipient, her domestic partner [E.G.]) . . . . [K.M.]'s testimony on the subject of her execution *66 of the ovum donor form was contradictory and not always credible.
"[K.M.] and [E.G.] agreed prior to the conception of the children that [E.G.] would be the sole parent unless the children were later adopted, and [E.G.] told [K.M.] prior to her ovum donation that she ([E.G.]) would not consider an adoption by [K.M.] until some years later. [E.G.] and [K.M.] agreed in advance of the ovum donation that they would not tell others of [K.M.]'s genetic connection to the children (they also agreed that if and when it became appropriate they would consider how to inform the children); and they abided by this agreement until late 1999.
". . . By voluntarily signing the ovum donation form, [K.M.] was donating genetic material. Her position was analogous to that of a sperm donor, who is treated as a legal stranger to a child if he donates sperm through a licensed physician and surgeon under Family Code section 7613[, subdivision] (b). The Court finds no reason to treat ovum donors as having greater claims to parentage than sperm donors. . . .
"The Court accepts the proposition that a child may have two legal mothers and assumed it to be the law in its analysis of the evidence herein. [¶] . . . [¶]
"[K.M.]'s claim to `presumed' parenthood rests upon her contention that she has met the criteria of Family Code section 7611[, subdivision] (d). . . . [K.M.] . . . has failed to establish either that she received the twins into her home or that she held them out `as [her] natural child[ren.]' Although [K.M.] treated the twins in all regards as though they were her own (and there can be no question but that they are fully bonded to her as such), the children were received into the parties' home as [E.G.]'s children and, up until late 1999, both parties scrupulously held confidential [petitioner]'s `natural,' i.e., in this case, her genetic relationship to the children.
"[E.G.] is not estopped by her conduct. . . . The Court finds that [petitioner] was not misled by any such conduct; that she knew that [respondent] did not intend thereby to confer parental rights upon her. . . ."
The Court of Appeal affirmed the judgment, ruling that K.M. did not qualify as a parent "because substantial evidence supports the trial courts factual finding that only E.G. intended to bring about the birth of a child whom she intended to raise as her own." The court observed that "the status of K.M. . . . . is consistent with the status of a sperm donor under the [Uniform Parentage Act], i.e., treated in law as if he were not the natural father of a child thereby conceived. [Citation.]" Having concluded that the parties intended at the time of conception that only E.G. would be the child's mother, the court concluded that the parties actions following the birth did not alter this agreement. The Court of Appeal concluded that if the parties had changed their intentions and wanted K.M. to be a parent, their only option was adoption.
We granted review.

DISCUSSION
K.M. asserts that she is a parent of the twins because she supplied the ova that were fertilized in vitro and implanted in her lesbian partner, resulting in the birth of the twins. As we will explain, we agree that K.M. is a parent of the twins because she supplied the ova that produced the children, and Family Code section 7613, subdivision (b)[2] (hereafter section 7613(b)), which provides that a man is not a father if he provides semen to a *67 physician to inseminate a woman who is not his wife, does not apply because K.M. supplied her ova to impregnate her lesbian partner in order to produce children who would be raised in their joint home.[3]
The determination of parentage is governed by the Uniform Parentage Act (UPA). (§ 7600 et seq.) As we observe in the companion case of Elisa B. v. Superior Court, supra, ___ Cal.4th ___, ___, 33 Cal.Rptr.3d at 51, 117 P.3d at 664-665, the UPA defines the "`[p]arent and child relationship, [which] extends equally to every child and to every parent, regardless of the marital status of the parents.' (§ 7602.)"
In Johnson v. Calvert (1993) 5 Cal.4th 84, 87, 19 Cal.Rptr.2d 494, 851 P.2d 776, we determined that a wife whose ovum was fertilized in vitro by her husband's sperm and implanted in a surrogate mother was the "natural mother" of the child thus produced. We noted that the UPA states that provisions applicable to determining a father and child relationship shall be used to determine a mother and child relationship "insofar as practicable." (Johnson v. Calvert, supra, at p. 90, 19 Cal.Rptr.2d 494, 851 P.2d 776, citing former Civ.Code, § 7015, now Fam.Code, § 7650.) We relied, therefore, on the provisions in the UPA regarding presumptions of paternity and concluded that "genetic consanguinity" could be the basis for a finding of maternity just as it is for paternity. (Johnson v. Calvert, supra, 5 Cal.4th at p. 92, 19 Cal.Rptr.2d 494, 851 P.2d 776; In re Marriage of Buzzanca (1998) 61 Cal.App.4th 1410, 1415, 72 Cal.Rptr.2d 280.) Under this authority, K.M.'s genetic relationship to the children in the present case constitutes "evidence of a mother and child relationship as contemplated by the Act. [Citations.]" (Johnson, supra, at p. 92, 19 Cal.Rptr.2d 494, 851 P.2d 776.)
The Court of Appeal in the present case concluded, however, that K.M. was not a parent of the twins, despite her genetic relationship to them, because she had the same status as a sperm donor. Section 7613(b) states: "The donor of semen provided to a licensed physician and surgeon for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived." In Johnson, we considered the predecessor statute to section 7613(b), former Civil Code section 7005. (Johnson v. Calvert, supra, 5 Cal.4th 84, 100, fn. 14, 19 Cal.Rptr.2d 494, 851 P.2d 776.) We did not discuss whether this statute applied to a woman who provides ova used to impregnate another woman, but we observed that "in a true `egg donation' situation, where a woman gestates and gives birth to a child formed from the egg of another woman with the intent to raise the child as her own, the birth mother is the natural mother under California law." (Id. at p. 93, fn. 10, 19 Cal.Rptr.2d 494, 851 P.2d 776.) We held that the statute did not apply under the circumstances in Johnson, because the husband and wife in Johnson did not intend to "donate" their sperm and ova to the surrogate mother, but rather "intended to procreate a child genetically related to them by the only available means." *68 (Johnson, supra, at p. 100, 19 Cal.Rptr.2d 494, 851 P.2d 776.)
The circumstances of the present case are not identical to those in Johnson, but they are similar in a crucial respect; both the couple in Johnson and the couple in the present case intended to produce a child that would be raised in their own home. In Johnson, it was clear that the married couple did not intend to "donate" their semen and ova to the surrogate mother, but rather permitted their semen and ova to be used to impregnate the surrogate mother in order to produce a child to be raised by them. In the present case, K.M. contends that she did not intend to donate her ova, but rather provided her ova so that E.G. could give birth to a child to be raised jointly by K.M. and E.G. E.G. hotly contests this, asserting that K.M. donated her ova to E.G., agreeing that E.G. would be the sole parent. It is undisputed, however, that the couple lived together and that they both intended to bring the child into their joint home. Thus, even accepting as true E.G.'s version of the facts (which the superior court did), the present case, like Johnson, does not present a "true `egg donation'" situation. (Johnson v. Calvert, supra, 5 Cal.4th 84, 93, fn. 10, 19 Cal.Rptr.2d 494, 851 P.2d 776.) K.M. did not intend to simply donate her ova to E.G., but rather provided her ova to her lesbian partner with whom she was living so that E.G. could give birth to a child that would be raised in their joint home. Even if we assume that the provisions of section 7613(b) apply to women who donate ova, the statute does not apply under the circumstances of the present case. An examination of the history of 7613(b) supports our conclusion.
The predecessor to section 7613(b), former Civil Code section 7005, was enacted in 1975 as part of the UPA. (Stats.1975, ch. 1244, § 11, pp. 3197-3198.) Section 5, subdivision (b), of the Model UPA states: "The donor of semen provided to a licensed physician for use in artificial insemination of a married woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived." The comment to this portion of the model act notes that this provision was not intended to solve all questions posed by the use of artificial insemination: "This Act does not deal with many complex and serious legal problems raised by the practice of artificial insemination. It was though[t] useful, however, to single out and cover in this Act at least one fact situation that occurs frequently." (9B West's. U. Laws Ann. (1987) U. Parentage Act, com. to § 5, pp. 301-302.)
Although the predecessor to section 7613 was based upon the Model UPA, the California Legislature made one significant change; it expanded the reach of the provision to apply to both married and unmarried women. "Section 7005 is derived almost verbatim from the UPA as originally drafted, with one crucial exception. The original UPA restricts application of the nonpaternity provision of subdivision (b) to a `married woman other than the donor's wife.' [Citation.] The word `married' is excluded from subdivision (b) of section 7005, so that in California, subdivision (b) applies to all women, married or not. [¶] Thus, the California Legislature has afforded unmarried as well as married women a statutory vehicle for obtaining semen for artificial insemination without fear that the donor may claim paternity, and has likewise provided men with a statutory vehicle for donating semen to married and unmarried women alike without fear of liability for child support." (Jhordan C. v. Mary K. (1986) 179 Cal.App.3d 386, 392, 224 Cal.Rptr. 530, fn. omitted.)
Under the Model UPA, a man who donated semen that was used to impregnate *69 a woman who was married to someone other than the donor would not be considered the father of the resulting child. But the provision would not apply, and the semen donor would be considered the father of the child, if the woman impregnated was unmarried. Therefore, this provision of the model act would not apply if a man provided semen that was used to impregnate his unmarried partner in order to produce a child that would be raised in their joint home, and the man would be considered the father of the resulting child.
In adopting the model act, California expanded the reach of this provision by omitting the word "married," so that unmarried women could avail themselves of artificial insemination. This omission was purposeful. As originally introduced in 1975, Senate Bill No. 347 (1975-1976 Reg. Sess.) proposed adopting verbatim the language of the model UPA and, thus, would have limited the reach of former Civil Code section 7005 to "married women." (Sen. Bill No. 347 (1975-1976 Reg. Sess.) § 11, as introduced Feb. 4, 1975.) On May 8, 1975, however, the bill was amended in the Senate to delete the word "married."[4]
It is clear, therefore, that California intended to expand the protection of the model act to include unmarried women so that unmarried women could avail themselves of artificial insemination. But there is nothing to indicate that California intended to expand the reach of this provision so far that it would apply if a man provided semen to be used to impregnate his unmarried partner in order to produce a child that would be raised in their joint home. It would be surprising, to say the least, to conclude that the Legislature intended such a result. The Colorado Supreme Court considered a related issue and reached a similar conclusion.
In In Interest of R.C. (Colo.1989) 775 P.2d 27, 29, the Colorado Supreme Court addressed a Colorado statute identical to section 7613(b), which applied to both married and unmarried women. At issue were the parental rights, if any, of a man who provided semen to a physician that was used to impregnate an unmarried friend of the man. The man claimed that the woman had promised that he would be treated as the child's father. The court recognized that the Model UPA addressed only the artificial insemination of a woman married to someone other than the semen donor, adding that the parental rights of a semen donor are "least clearly understood when the semen donor is known and the recipient is unmarried." (R.C., supra, 775 P.2d at pp. 31, 33-34.) The court concluded that the statute did not apply when a man donated semen to an unmarried woman with the understanding that he would be the father of the resulting child: "[W]e conclude that the General Assembly neither considered nor intended to affect the rights of known donors who gave their semen to unmarried women for use in artificial insemination with the agreement that the donor would be the father of any child so conceived. [The statute] simply does not apply in that circumstance." (Id. at p. 35.)
The Colorado Supreme Court was thus faced with a situation in which a man provided semen, through a physician, to an unmarried "friend" who allegedly had promised that the man would be the father of the resulting child. The court concluded that the Model UPA, and the Colorado *70 statute based upon it, were not intended to apply to such circumstances. We are faced with an even more compelling situation, because K.M. and E.G. were more than "friends" when K.M. provided her ova, through a physician, to be used to impregnate E.G.; they lived together and were registered domestic partners. Although the parties dispute whether both women were intended to be parents of the resulting child, it is undisputed that they intended that the resulting child would be raised in their joint home. Neither the Model UPA, nor section 7613(b) was intended to apply under such circumstances.[5]
As noted above, K.M.'s genetic relationship with the twins constitutes evidence of a mother and child relationship under the UPA (Johnson v. Calvert, supra, 5 Cal.4th 84, 92, 19 Cal.Rptr.2d 494, 851 P.2d 776) and, as explained above, section 7613(b) does not apply to exclude K.M. as a parent of the twins. The circumstance that E.G. gave birth to the twins also constitutes evidence of a mother and child relationship. (Johnson v. Calvert, supra, 5 Cal.4th at p. 92, 19 Cal.Rptr.2d 494, 851 P.2d 776.) Thus, both K.M. and E.G. are mothers of the twins under the UPA.[6]
It is true we said in Johnson that "for any child California law recognizes only one natural mother." (Johnson v. Calvert, supra, 5 Cal.4th 84, 92, 19 Cal.Rptr.2d 494, 851 P.2d 776.) But as we explain in the companion case of Elisa B. v. Superior Court, supra, ___ Cal.4th ___, ___, 33 Cal.Rptr.3d at 53, 117 P.3d at 666-667, this statement in Johnson must be understood in light of the issue presented in that case; "our decision in Johnson does not preclude a child from having two parents both of whom are women."
Justice Werdegar's dissent argues that we should determine whether K.M. is a parent using the "intent test" we developed in Johnson v. Calvert, supra, 5 Cal.4th 84, 19 Cal.Rptr.2d 494, 851 P.2d 776. In Johnson, an embryo created using the sperm and egg of a married couple was implanted in a surrogate mother. It was undisputed that the husband was the father of the resulting child, but the wife and the surrogate both claimed to be the mother. We recognized that both women "have adduced evidence of a mother and child relationship" under the UPAthe wife because she is genetically related to the child and the surrogate because she gave birth to the childbut we rejected the suggestion that, under the circumstances of that case, the child could have two mothers, leaving the child with three parents. (Id. at p. 92, fn. 8, 19 Cal.Rptr.2d 494, 851 P.2d 776.) In order to determine which woman was the child's sole mother under the UPA, we looked to their respective intents: "Because two women each have presented acceptable proof of maternity, we do not believe this case can be decided without enquiring into the parties' intentions. . . ." (Id. at p. 93, 19 Cal.Rptr.2d 494, 851 P.2d 776.)
As the dissent acknowledges, a child can have two mothers. Thus, this case differs *71 from Johnson in that both K.M. and E.G. can be the children's mothers. Unlike in Johnson, their parental claims are not mutually exclusive. K.M. acknowledges that E.G. is the twins' mother. K.M. does not claim to be the twins' mother instead of E.G., but in addition to E.G., so we need not consider their intent in order to decide between them. (In re Marriage of Moschetta (1994) 25 Cal.App.4th 1218, 1224, 30 Cal.Rptr.2d 893 [Johnson intent test does not apply when "[t]here is no `tie' to break."].) Rather, the parentage of the twins is determined by application of the UPA. E.G. is the twins' mother because she gave birth to them and K.M. also is the twins' mother because she provided the ova from which they were produced.
Justice Werdegar's dissent claims that we are "changing the law" by creating a "new rule" for determining whether a woman who supplies an ovum is the mother of the resulting child. (Dis. opn. of Werdegar, J., post, 33 Cal.Rptr.3d at pp. 76-77, 117 P.3d at pp. 685-687.) We are not. Nothing in Johnson suggests that the intent test applies in cases not involving surrogacy agreements, and the dissent agrees that the linchpin of the decision in Johnson  that a child cannot have two mothers  does not apply here. (Id., 33 Cal.Rptr.3d at p. 63, 117 P.3d at p. 675.) We simply hold that section 7613(b), which creates an exception to the usual rules governing parentage that applies when a man donates semen to inseminate a woman who is not his wife, does not apply under the circumstances of this case in which K.M. supplied ova to impregnate her lesbian partner in order to produce children who would be raised in their joint home. Because the exception provided in section 7613(b) does not apply, K.M.'s parentage is determined by the usual provisions of the UPA. As noted above, under the UPA, K.M.'s genetic relationship to the twins constitutes "evidence of a mother and child relationship." (Johnson v. Calvert, supra, 5 Cal.4th 84, 92, 19 Cal.Rptr.2d 494, 851 P.2d 776.)
It would be unwise to expand application of the Johnson intent test as suggested by Justice Werdegar's dissent beyond the circumstances presented in Johnson. Usually, whether there is evidence of a parent and child relationship under the UPA does not depend upon the intent of the parent. For example, a man who engages in sexual intercourse with a woman who assures him, falsely, that she is incapable of conceiving children is the father of a resulting child, despite his lack of intent to become a father.
Justice Werdegar's dissent states that predictability in this area is important, but relying upon a later judicial determination of the intent of the parties, as the dissent suggests, would not provide such predictability. The present case is a good example. Justice Werdegar's dissent concludes that K.M. did not intend to become a parent, because the superior court "found on the basis of conflicting evidence that she did not," noting that "[w]e must defer to the trial court's findings on this point because substantial evidence supports them." (Dis. opn. of Werdegar, J., post, 33 Cal.Rptr.3d at pp. 76-77, 117 P.3d at pp. 685-687.) Had the superior court reached the opposite conclusion, however, the dissent presumably again would defer to the trial court's findings and reach the opposite conclusion that K.M. is a parent of the twins. Rather than provide predictability, therefore, using the intent test would rest the determination of parentage upon a later judicial determination of intent made years after the birth of the child.
Justice Werdegar's dissent cites Troxel v. Granville (2000) 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 for the proposition that "We cannot recognize K.M. as a *72 parent without diminishing E.G.'s existing parental rights." (Dis. opn. of Werdegar, J., post, 33 Cal.Rptr.3d at p. 79, 117 P.3d at p. 688.) The high court's decision in Troxel has no application here. Neither K.M.'s nor E.G.'s claim to parentage preceded the other's. K.M.'s claim to be the twins' mother because the twins were produced from her ova is equal to, and arose at the same time as, E.G.'s claim to be the twins' mother because she gave birth to them.
The superior court in the present case found that K.M. signed a waiver form, thereby "relinquishing and waiving all rights to claim legal parentage of any children who might result." But such a waiver does not affect our determination of parentage. Section 7632 provides: "Regardless of its terms, an agreement between an alleged or presumed father and the mother or child does not bar an action under this chapter." (See In re Marriage of Buzzanca, supra, 61 Cal.App.4th 1410, 1426, 72 Cal.Rptr.2d 280 ["It is well established that parents cannot, by agreement, limit or abrogate a child's right to support." (Fn.omitted.)].) A woman who supplies ova to be used to impregnate her lesbian partner, with the understanding that the resulting child will be raised in their joint home, cannot waive her responsibility to support that child. Nor can such a purported waiver effectively cause that woman to relinquish her parental rights.
In light of our conclusion that section 7613(b) does not apply and that K.M. is the twins' parent (together with E.G.), based upon K.M.'s genetic relationship to the twins, we need not, and do not, consider whether K.M. is presumed to be a parent of the twins under section 7611, subdivision (d), which provides that a man is presumed to be a child's father if "[h]e receives the child into his home and openly holds out the child as his natural child."

DISPOSITION
The judgment of the Court of Appeal is reversed.
GEORGE, C.J., BAXTER and CHIN, JJ., concur.
Dissenting Opinion by KENNARD, J.
Unlike the majority, I would apply the controlling statutes as written. The statutory scheme for determining parentage contains two provisions that resolve K.M.'s claim to be a parent of the twins born to E.G. Under one provision, a man who donates sperm for physician-assisted artificial insemination of a woman to whom he is not married is not the father of the resulting child. (Fam.Code, § 7613, subd. (b).)[1] Under the other provision, rules for determining fatherhood are to be used for determining motherhood "[i]nsofar as practical." (Id., § 7650.) Because K.M. donated her ova for physician-assisted artificial insemination and implantation in another woman, and knowingly and voluntarily signed a document declaring her intention not to become a parent of any resulting children, she is not a parent of the twins.

I.
In 1994, K.M. and E.G. began living together as a couple, and some months later they registered as domestic partners. E.G. had long wanted to become a mother but had been unsuccessful in conceiving. She eventually pursued in vitro fertilization, but her body failed to produce sufficient ova. Her physician then suggested that she obtain ova from K.M., her partner. K.M. orally agreed that she would *73 donate ova, and that E.G. would be the only parent of any resulting child unless K.M. were later to become a parent through a formal second-parent adoption. K.M. evidenced her intent that E.G. was to be the sole parent by signing the ova donor form, which provided that she renounced any claim to her donated ova, a fetus, or a child born from her ova.
K.M. donated her ova, which were fertilized with sperm from an anonymous donor and implanted in E.G., who ultimately gave birth to twin girls. The twins lived with the couple for five years. After the couple separated, K.M. petitioned the superior court for establishment of a parental relationship with the twins, and for rights to custody and visitation.
After a week-long hearing, at which considerable evidence was presented, the superior court dismissed K.M.'s parentage action. Describing K.M.'s testimony about her misunderstanding of the ova donor form as "not always credible," the trial court found that K.M. and E.G. had agreed "prior to the conception of the children" that E.G. would be their only parent. The court observed that E.G.'s intent to be the sole parent "responsible for the support and maintenance of any children born" of the ova implanted in her uterus was evidenced when she signed the ova recipient form acknowledging that the "children produced" by the in vitro fertilization procedure would be her children "with all the rights and privileges accompanying such status." The court also noted that K.M. had failed to show that she had no choice but to sign the standard form provided by the in vitro fertilization clinic, and that she could not have donated her ova under a different agreement in which she was "designated" as "an intended parent" of any child born to E.G. Hence it ruled that K.M. had voluntarily relinquished any claim to being a mother of any children born to E.G.
The court further ruled that K.M. did not meet the statutory definition of a "presumed" mother (§ 7611, subd. (d); Elisa B. v. Superior Court (Aug. 22, 2005, S125912) ___ Cal.4th ___, ___, 33 Cal.Rptr.3d at 58, 117 P.3d at 670-671 (Elisa B.)), because she had failed to meet both prongs of the statutory test: receiving the children into her home, and holding them out as her natural children. Although K.M. had received the twins into her home, she had not held them out as her natural children;[2] indeed she had not disclosed to others "her genetic connection" to the twins until 1999, when the couple's relationship began to falter.
The Court of Appeal affirmed the trial court.

II.
The Court of Appeal held that K.M. had made a voluntary and informed choice to donate her ova to E.G., and that K.M.'s status with respect to any child born as a result of the ova donation was analogous to that of a sperm donor, who, by statute, is treated as if he were not the natural father of any child conceived as a result of the sperm donation. "The donor of semen provided to a licensed physician and surgeon for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived." (§ 7613, subd. (b).) By analogy I would *74 apply that statute here. Section 7650 states that "[i]nsofar as is practicable" the provisions "applicable" to a father and child relationship are to be used to determine a mother and child relationship.
Here it is "practicable" to treat a woman who donates ova to a licensed physician for in vitro fertilization and implantation in another woman,[3] in the same fashion as a man who donates sperm to a licensed physician for artificial insemination of a woman to whom he is not married. Treating male and female donors alike is not only practicable, but it is also consistent with the trial court's factual finding here that K.M. intended "to donate ova to E.G." so that E.G. would be the sole mother of a child born to her.
As the majority here explains, California's Legislature has drafted the sperm donor statute in such a way as to allow unmarried women to use artificial insemination to conceive, and to permit them to become the sole parent of any child so conceived, if they use sperm that the donor has provided to a licensed physician. (Maj. opn., ante, 33 Cal.Rptr.3d at pp. 68-69, 117 P.3d at pp. 679-680.) Here, E.G. used sperm donated in that fashion, ensuring that the sperm donor would have no claim of fatherhood to any child to whom she gave birth. This she was entitled to do under California law. (Jhordan C. v. Mary K. (1986) 179 Cal.App.3d 386, 392, 224 Cal.Rptr. 530.)
I recognize that California law does not expressly address the maternal status of ova donors. But, as I have explained in the past, the Uniform Parentage Act, as codified in our Family Code, remains "the only statutory guidance this court has in resolving this case." (Johnson v. Calvert (1993) 5 Cal.4th 84, 112, 19 Cal.Rptr.2d 494, 851 P.2d 776 (dis. opn. of Kennard, J.) (Johnson).) Accordingly, as I said earlier, I would apply the sperm donor statute to women who donate their ova in compliance with section 7613, subdivision (b). As the trial court here explained: K.M.'s "position was analogous to that of a sperm donor, who is treated as a legal stranger to the child if he donates sperm through a licensed physician and surgeon." Like the trial court, I see "no reason to treat ovum donors as having greater claims to parentage than sperm donors."
The analogy between sperm and ova donors is not new. Indeed, in Johnson, supra, 5 Cal.4th page 93, footnote 10, 19 Cal.Rptr.2d 494, 851 P.2d 776, this court signalled its view that an ova donor would not be treated as the child's mother. Johnson held that "in a true `egg donation' situation, where a woman gestates and gives birth to a child formed from the egg of another women with the intent to raise the child as her own, the birth mother is the natural mother under California law." (Ibid.) Nearly two years after that decision, E.G. in this case undertook in vitro fertilization with ova from K.M.
In the 12 years since this court's decision in Johnson, supra 5 Cal.4th 84, 19 Cal.Rptr.2d 494, 851 P.2d 776, an unknown number of Californians have made procreative choices in reliance on it. For example, in the companion case of Kristine H. v. Lisa R. (Aug. 22, 2005, S126945) ___ Cal.4th ___, ___, 33 Cal.Rptr.3d 83, 84, 117 P.3d 691, 693, a lesbian couple obtained *75 a prebirth stipulated judgment declaring them to be "the joint intended legal parents" of the child born to one of them (italics added), language they presumably used in order to bring themselves within Johnson where the preconception intent to be come a parent is the determinative inquiry. (Johnson, supra, 5 Cal.4th at p. 93, 19 Cal.Rptr.2d 494, 851 P.2d 776.) We do know that prebirth judgments of parentage on behalf of the nonbiologically related partner of a child's biological parent have been entered in this state, and that such judgments were touted to same-sex couples as less expensive and time consuming than second parent adoption. (Doskow, The Second Parent Trap: Parenting For Same-Sex Couples in a Brave New World (1999) 20 J. Juv. L. 1, 21, fns. 117 & 118 [citing judgments entered in San Francisco, Los Angeles, and San Luis Obispo Counties]; see also Mak, Partners in Law, 24 L.A. Law. (July-Aug.2001) 35, 38, 40.) How will today's majority holding affect the validity of the various procreative choices made in reliance on Johnson? The majority's decision offers no answers.
The majority's desire to give the twins a second parent is understandable and laudable. To achieve that worthy goal, however, the majority must rewrite a statute and disregard the intentions that the parties expressed when the twins were conceived. The majority amends the sperm-donor statute by inserting a new provision making a sperm donor the legal father of a child born to a woman artificially inseminated with his sperm whenever the sperm donor and the birth mother "intended that the resulting child would be raised in their joint home," even though both the donor and birth mother also intended that the donor not be the child's father. (Maj. opn., ante, 33 Cal.Rptr.3d at p. 70, 117 P.3d at pp. 680-681, italics added.) Finding nothing in the statutory language or history to support this construction, I reject it. Relying on the plain meaning of the statutory language, and the trial court's findings that both K.M. and E.G. intended that E.G. would be the only parent of any children resulting from the artificial insemination, I would affirm the judgment of the Court of Appeal, which in turn affirmed the trial court, rejecting K.M.'s claim to parentage of the twins born to E.G.
Dissenting Opinion by WERDEGAR, J.
The majority determines that the twins who developed from the ova K.M. donated to E.G. have two mothers rather than one. While I disagree, as I shall explain, with that ultimate conclusion, I agree with the majority's premise that a child can have two mothers. Our previous holding that "for any child California law recognizes only one natural mother" (Johnson v. Calvert (1993) 5 Cal.4th 84, 92, 19 Cal.Rptr.2d 494, 851 P.2d 776 (Johnson)) must be understood in the context in which it arosea married couple who intended to become parents and provided their fertilized ova to a gestational surrogate who did not intend to become a parentand, thus understood, may properly be limited to cases in which to recognize a second mother would inject an unwanted third parent into an existing family. When, in contrast to Johnson, no natural[1] or adoptive father exists, two women who intend to become mothers of the same child may do so either through adoption (Sharon S. v. Superior Court (2003) 31 Cal.4th 417, 2 Cal.Rptr.3d 699, 73 P.3d 554) or because both qualify as natural mothers under the Uniform Parentage Act (Fam.Code, § 7600 et seq.) (UPA), one having donated the ovum and the other having given *76 birth (see Johnson, at p. 92, 19 Cal.Rptr.2d 494, 851 P.2d 776).
While scientific advances in reproductive technology now afford individuals previously unimagined opportunities to become parents, the same advances have also created novel, sometimes heartbreaking issues concerning the identification of the resulting children's legal parents. Declarations of parentage in this context implicate complex and delicate biological, personal, legal and social policy considerations. For these reasons, courts have sought above all to avoid foreseeable disputes over parentage with rules that provide predictability by permitting the various persons who must cooperate to bring children into the world through assisted reproduction to determine in advance who will and will not be parents, based on their expressed and voluntarily chosen intentions. (See, e.g., Johnson, supra, 5 Cal.4th 84, 93-95, 19 Cal.Rptr.2d 494, 851 P.2d 776.)
Precisely because predictability in this area is so important, I cannot agree with the majority that the children in this case do in fact have two mothers. Until today, when one woman has provided the ova and another has given birth, the established rule for determining disputed claims to motherhood was clear: we looked to the intent of the parties. "[I]n a true `egg donation' situation, where a woman gestates and gives birth to a child formed from the egg of another woman with the intent to raise the child as her own, the birth mother is the natural mother under California law." (Johnson, supra, 5 Cal.4th 84, 93, fn. 10, 19 Cal.Rptr.2d 494, 851 P.2d 776.) Contrary to the majority's apparent assumption, to limit Johnson's holding that a child can have only one mother to cases involving existing two-parent families does not require us to abandon Johnson's intent test as the method for determining disputed claims of motherhood arising from the use of reproductive technology. Indeed, we have no other test sufficient to the task.
Furthermore, to apply Johnson's intent test to the facts of this case necessarily leads to the conclusion that E.G. is a mother and K.M. is not. That E.G. intended to become the motherand the only motherof the children to whom she gave birth is unquestioned. Whether K.M. for her part also intended to become the children's mother was disputed, but the trial court found on the basis of conflicting evidence that she did not. We must defer to the trial court's findings on this point because substantial evidence supports them. K.M. represented in connection with the ovum donation process, both orally and in writing, that she did not intend to become the children's mother, and consistently with those representations subsequently held the children out to the world as E.G.'s but not her own. Thus constrained by the facts, the majority can justify its conclusion that K.M. is also the children's mother only by changing the law. This the majority does by displacing Johnson's intent testat least for the purposes of this casewith the following new rule: a woman who has "supplied her ova to impregnate her lesbian partner in order to produce children who would be raised in their joint home" (maj. opn., ante, 33 Cal.Rptr.3d at p. 67, 117 P.3d at p. 678; see also id., 33 Cal.Rptr.3d at pp. 63, 67-68, 70, 71, 72, 117 P.3d at pp. 674-675, 678-679, 680-681, 681-682, 682-683) is a mother of the resulting children regardless of any preconception manifestations of intent to the contrary.
I find the majority's reasons for not applying the Johnson intent test unpersuasive. The majority criticizes the test as basing "the determination of parentage upon a later judicial determination of intent made years after the birth of the *77 child." (Maj. opn., ante, 33 Cal.Rptr.3d at pp. 71-72, 117 P.3d at pp. 681-683.) But the task of determining the intent of persons who have undertaken assisted reproduction is not fundamentally different than the task of determining intent in the context of disputes involving contract, tort or criminal law, something courts have done satisfactorily for centuries. The expectation that courts will in most cases accurately decide factual issues such as intent is one of the fundamental premises of our judicial system. Indeed, the majority itself expresses willingness to continue applying the Johnson intent test to determine whether gestational surrogacy agreements are enforceable. This position leaves no plausible basis for refusing to apply the same test to determine whether ovum donation agreements are enforceable. Ovum donation and gestational surrogacy agreements are two sides of the same coin; each involves an ovum provider, a gestator, and an agreement about who will become the parent or parents of any resulting offspring. Indeed, when two women divide in this way the genetic and gestational components of motherhood, only an examination of their intent permits us to determine whether we are dealing with an ovum donation agreement, a gestational surrogacy agreement, or neither. If courts can perform one of these tasks acceptably, they can also perform the other.[2]
No more persuasive is the majority's suggestion that to respect the formally expressed intent of the parties to an ovum donation agreement is prohibited by the rule that parental obligations may not be waived by contract. (Maj. opn., ante, 33 Cal.Rptr.3d at pp. 71-72, 117 P.3d at pp. 681-683.) We expressly rejected a similar argument directed against a gestational surrogacy agreement in Johnson, supra, 5 Cal.4th 84, 95-97, 19 Cal.Rptr.2d 494, 851 P.2d 776. Certainly parental obligations may not be waived by contract. (Fam.Code, § 7632.) But Johnson's intent test does not enforce ovum donation and gestational surrogacy agreements; it merely directs courts to consider such documents, along with all other relevant evidence, in determining preconception intent.
As a final reason for rejecting the intent test, the majority suggests that to apply the test outside the context of Johnson might shield from the obligations of fatherhood, contrary to existing law, a man who, lacking the intent to become a father, "engages in sexual intercourse with a woman who assures him, falsely, that she is incapable of conceiving children. . . ." (Maj. opn., ante, 33 Cal.Rptr.3d at p. 71, 117 P.3d at pp. 681-682.) But no one, to my knowledge, proposes to apply the intent test to determine the parentage of children conceived through ordinary sexual reproduction. This court adopted the intent test to resolve cases of assisted reproduction in which disputes over motherhood arise because one woman has provided the ova and another has gestated them. Both Johnson, supra, 5 Cal.4th 84, 19 Cal.Rptr.2d 494, 851 P.2d 776, and the case before us belong to that category. Although the majority may be correct in asserting that "[u]sually, whether there is evidence of a parent and child relationship under the UPA does not depend upon the intent of the parent" (maj. opn., ante, 33 Cal.Rptr.3d at p. 71, 117 P.3d at pp. 681-682), we adopted the intent test precisely *78 because the UPA does not expressly resolve conflicting claims to motherhood arising from ovum transplants. The majority's speculation about men who engage in sexual activity despite mental reservations about fatherhood is irrelevant.
The new rule the majority substitutes for the intent test entails serious problems. First, the rule inappropriately confers rights and imposes disabilities on persons because of their sexual orientation. In a standard ovum donation agreement, such as the agreement between K.M. and E.G., the donor confirms her intention to assist another woman to become a parent without the donor becoming a parent herself. The majority's rule vitiates such agreements when its conditions are satisfiedconditions that include the fact the parties to the agreement are lesbian. Although the majority denies that its rule depends on sexual orientation (maj. opn., ante, 33 Cal.Rptr.3d at p. 67, 117 P.3d at p. 678, fn. 3), the opinion speaks for itself. The majority has chosen to use the term "lesbian" no less than six times in articulating its holding. (Id., 33 Cal.Rptr.3d at pp. 63, 67, 117 P.3d at pp. 674-675, fn. 3, 9, 15, 17.) Moreover, the majority prevents future courts from applying its holding automatically to persons other than lesbians by stating that it "decide[s] only the case before us, which involves a lesbian couple who registered as domestic partners." (Id., 33 Cal.Rptr.3d at p. 67, 117 P.3d at p. 678, fn. 3.) I see no rational basisand the majority articulates nonefor permitting the enforceability of an ovum donation agreement to depend on the sexual orientation of the parties. Indeed, lacking a rational basis, the rule may well violate equal protection. (See Romer v. Evans (1996) 517 U.S. 620, 631-636, 116 S.Ct. 1620, 134 L.Ed.2d 855; Gay Law Students Assn. v. Pacific Tel. & Tel. Co. (1979) 24 Cal.3d 458, 467-475, 156 Cal.Rptr. 14, 595 P.2d 592.) Why should a lesbian not have the same right as other women to donate ova without becoming a mother, or to accept a donation of ova without accepting the donor as a coparent, even if the donor and recipient live together and both plan to help raise the child?[3]
Having created a new rule to decide certain cases of disputed parentage arising from assisted reproduction, the majority seeks through various means to limit the number of cases to which the new rule will apply. Through this effort, the majority creates more problems than it solves.
Although the majority at one point seems to suggest that its holding applies only to persons who have registered as domestic partners (maj. opn., ante, 33 Cal.Rptr.3d at p. 67, 117 P.3d at p. 678, fn. 3), it elsewhere articulates its holding without reference to domestic partnership. (Id., 33 Cal.Rptr.3d at pp. 63, 67, 68, 71, 72, 117 P.3d at pp. 674-675, 678, 679, 681-682, 682-683.) The resulting ambiguity flags a serious problem. K.M. and E.G. registered as domestic partners in October 1994 and terminated their domestic partnership in March 2001. Not until January 1, 2003, however, did California law give domestic partners rights and responsibilities with respect to each others' children. (Fam.Code, § 297.5, subd. (d), added by Stats.2003, ch. 421, eff. Jan. 1, 2005.) The new law expressly does not apply to persons like K.M. and E.G., who terminated their domestic partnerships before January 1, 2005. (Id., § 299.3, subd. (a).) For the majority to base its holding, even in part, *79 on K.M.'s and E.G.'s domestic partnership is to hold, contrary to statute and apparent legislative intent, that domestic partnership under prior laws did affect parental rights and obligations.
Other problems arise from the majority's attempt to limit its holding to cases in which the ovum donor and birth mother intend to raise the children together. Except in the context of the majority's new rule, a person's preconception intent to participate in raising a child has no relevance to the determination of natural parentage. The duty to raise children (by personal care or through payment of child support) is imposed by law regardless of the parents' intent or wishes. Many persons who become parents do not intend to raise children (e.g., casual inseminators and parents who abandon their babies) and, conversely, many people intend to raise children without becoming parents (e.g., nannies and some stepparents and grandparents). To make the determination of natural parentage rest in part on the intent to raise a child injects into that determination a best interests factorsomething we have previously refused to do. (Johnson, supra, 5 Cal.4th 84, 93, fn. 10, 19 Cal.Rptr.2d 494, 851 P.2d 776.) I realize the court in Johnson wrote that "she who intended to procreate the childthat is, she who intended to bring about the birth of a child that she intended to raise as her ownis the natural mother under California law." (Id., at p. 93, 19 Cal.Rptr.2d 494, 851 P.2d 776.) But the phrase "raise as her own" (ibid., italics added) in that context did not refer simply to providing childcare; instead, it meant that the woman in question intended to be a parentto raise a child of her own. In no sense did the Johnson court base its decision of parentage on the question of who would provide childcare. By analogy, Family Code section 7611, subdivision (d), which creates the presumption that a man who "receives [a] child into his home and openly holds out the child as his natural child" is not satisfied simply because a man receives the child into his home; to become a presumed father he must also hold out the child as his natural child.
Perhaps the most serious problem with the majority's new rule is that it threatens to destabilize ovum donation and gestational surrogacy agreements. One important function of Johnson's intent test was to permit persons who made use of reproductive technology to create, before conception, settled and enforceable expectations about who would and would not become parents. Johnson, supra, 5 Cal.4th 84, 19 Cal.Rptr.2d 494, 851 P.2d 776, thus gave E.G. a right at the time she conceived to expect that she alone would be the parent of her childrena right the majority now retrospectively abrogates. E.G.'s expectation has a constitutional dimension. (See Troxel v. Granville (2000) 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 [due process clause protects a parent's fundamental right to make decisions concerning the care, custody and control of her children].) We cannot recognize K.M. as a parent without diminishing E.G.'s existing parental rights. In light of the majority's abrogation of Johnson and apparent willingness to ignore preconception manifestations of intent, at least in some cases, women who wish to donate ova without becoming mothers, serve as gestational surrogates without becoming mothers, or accept ovum donations without also accepting the donor as a coparent would be well advised to proceed with the most extreme caution. While the majority purports to limit its holding to cohabiting lesbians, and possibly only to those cohabiting lesbians who are also domestic partners, these limitations, as I have explained, rest on questionable legal grounds and may well not stand the test of time.
*80 I find the majority's extensive discussion of Family Code section 7613, subdivision (b), irrelevant and illogical. The statute provides that "[t]he donor of semen provided to a licensed physician and surgeon for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were not the natural father of a child thereby conceived." The majority concludes the statute does not apply to the case before us. I agree. Although provisions of the UPA that determine the father and child relationship apply "[i]nsofar as practicable" (Fam.Code, § 7650) to determine the mother and child relationship, the act's drafters did not contemplate that all provisions concerning fatherhood would be construed as affecting motherhood. Indeed, the drafters considered it "obvious that certain provisions [of the act] would not apply in an action to establish the mother and child relationship" and expressly left to courts the decision of which provisions should apply. (9B West's U. Laws Ann. (2001) U. Parentage Act (1973) com. to § 21, p. 494.) That the statute governing sperm donations (Fam.Code, § 7613, subd. (b)) was not intended to govern ovum donations is easy to conclude since the act was drafted in 1973, long before assisted reproduction and gestational surrogacy became commonplace. (9B West's U. Laws Ann., supra, U. Parentage Act (2000) Prefatory Note, p. 297.) The drafters' response to these scientific developments has not been to endorse a counter-textual reading of the provision governing sperm donation, but instead to withdraw the 1973 act entirely and replace it with a new act expressly addressing some of the issues that have arisen from the use of reproductive technology. (9B West's U. Laws Ann, supra, U. Parentage Act (2000) p. 303 et seq.) In short, Family Code section 7613, subdivision (b), has nothing to do with this case.
The majority seems to believe that, having concluded the sperm donation statute (Fam.Code, § 7613, subd. (b)) does not apply, one must necessarily conclude that K.M. is the mother of the children who developed from the ova she donated to E.G. This reasoning entails a non sequitur. The statute, when it applies, merely excludes someone as a possible parent; it does not establish parentage. In order to reach the further conclusion that K.M. is a parent, the majority must entertain a string of questionable assumptions: first, that we would refuse to apply the sperm donation statute (Fam.Code, § 7613, subd. (b), quoted ante, 33 Cal.Rptr.3d at p. 67, 117 P.3d at p. 678), despite its plain language, to cut off the parental rights and responsibilities of a man who donates his sperm through a physician to a woman who is not his wife but with whom he lives (maj. opn., ante, 33 Cal.Rptr.3d at pp. 68-70, 117 P.3d at pp. 679-681), and, second, that two women who live together and divide between themselves the genetic and gestational aspects of pregnancy must be treated in exactly the same way as the man and woman just posited (id., 33 Cal.Rptr.3d at p. 70, 117 P.3d at p. 681). The latter assumption, in turn, embodies additional, unstated assumptions about the effect of the equal protection clause. But ovum donation, which requires substantial medical and scientific assistance, is not sufficiently like sperm donation, which can easily be accomplished by unassisted laypersons, to require equal treatment under the law for all purposes. Accordingly, to recognize the sperm donation statute's inapplicability does not dispose of this case; it merely leaves us with the same question with which we began, namely, whether K.M. is a second mother of E.G.'s children. Until today, the Johnson intent test would have required us to answer the question in the negative. In my view, it still should.
*81 Perhaps the best way to understand today's decision is that we appear to be moving in cases of assisted reproduction from a categorical determination of parentage based on formal, preconception manifestations of intent to a case-by-case approach implicitly motivated at least in part by our intuitions about the children's best interests. We expressly eschewed a best interests approach in Johnson, supra, 5 Cal.4th 84, 19 Cal.Rptr.2d 494, 851 P.2d 776, explaining that it "raises the repugnant specter of governmental interference in matters implicating our most fundamental notions of privacy, and confuses concepts of parentage and custody." (Id., at p. 93, fn. 10, 19 Cal.Rptr.2d 494, 851 P.2d 776.) This case, in which the majority compels E.G. to accept K.M. as an unintended parent to E.G.'s children, in part because of E.G.'s and K.M.'s sexual orientation and the character of their private relationship, shows that Johnson's warning was prescient. Only legislation defining parentage in the context of assisted reproduction is likely to restore predictability and prevent further lapses into the disorder of ad hoc adjudication.
NOTES
[1] In order to protect the confidentiality of the minors, we will refer to the parties by their initials.
[2] Further undesignated statutory references are to the Family Code.
[3] Justice Werdegar's dissent asserts that our decision "inappropriately confers rights and imposes disabilities on persons because of their sexual orientation." (Dis. opn. of Werdegar, J., post, 33 Cal.Rptr.3d at pp. 77-78, 117 P.3d at pp. 686-688.) We do not. We decide only the case before us, which involves a lesbian couple who registered as domestic partners. We express no view regarding the rights of others and, of course, our "opinion is not authority for a proposition not therein considered." (Ginns v. Savage (1964) 61 Cal.2d 520, 524, fn. 2, 39 Cal.Rptr. 377, 393 P.2d 689.)
[4] The combined minutes of the May 3, 1975 and June 14, 1975 meetings of the Committee on Family Law, which are attached to the report of the Senate Committee on Judiciary on Senate Bill No. 347 (1975-1976 Reg. Sess.), states that "[t]he committee recommended the deletion of `married'" in the original version of the bill.
[5] The Court of Appeal in Steven S. v. Deborah D. (2005) 127 Cal.App.4th 319, 326, 25 Cal.Rptr.3d 482, held that section 7613(b) applied where the semen donor was known to the impregnated woman and they had had a sexual relationship. But the semen donor in that case did not live with the impregnated woman, so the court did not address whether the statute would apply if the child was to be raised in the semen donor's home.
[6] Contrary to the suggestion in Justice Werdegar's dissent (dis. opn. of Werdegar, J., post, 33 Cal.Rptr.3d at pp. 78-79, 80-81, 117 P.3d at pp. 687-688, 689-690), we do not consider whether it is in the twins' best interest for the woman who supplied the ova from which they were produced, intending to raise the children in her home, to be declared their natural mother. We simply follow the dictates of the UPA.
[1] All further statutory references are to the Family Code.
[2] This case is factually distinguishable from the companion case of Elisa B. because here K.M. did not, by her behavior after their birth, meet the statutory test triggering the presumption (§ 7611, subd. (d)) that she was a presumed mother of the twins. (Elisa B., supra, ___ Cal.4th at pp. ___-___, 33 Cal.Rptr.3d at 53-56, 117 P.3d at 666-669.)
[3] K.M. and E.G. were registered in San Francisco as domestic partners in 1995 at the time of the twins' birth. On March 30, 2001, E.G. filed a notice with the Clerk of the City and County of San Francisco dissolving the domestic partnership. As of January 1, 2005, domestic partners who are registered with the California Secretary of State have the same "rights and obligations" to "a child of either of them" as do spouses. (§ 297.5, subd. (d).) Obviously, this new statute has no application here.
[1] As when an unmarried woman becomes pregnant through physician-assisted artificial insemination pursuant to Family Code section 7613, subdivision (b).
[2] Having alternately embraced and criticized intent tests, the majority ironically concludes by making intent part of its own new test for parentage. That new test appears to require courts to determine whether the donor and recipient intended any offspring to be raised in their joint home. (See maj. opn., 33 Cal.Rptr.3d at pp. 63, 66-68, 71, 72, 117 P.3d at pp. 674-675, 677-679, 681-682.)
[3] That the majority's rule expressly applies only to lesbians creates the additional problem of requiring a formal, legal definition of "lesbian." Unless we are willing to adopt such a definition and to authorize courts to inquire into the private facts necessary to apply it, the rule is likely unworkable.