[715 NYS2d 19]

DEBORAH PERRY-ROGERS et al., Appellants, v RICHARD FASANO et al., Respondents.

DEBORAH PERRY-ROGERS et al., Respondents, v RICHARD FASANO et al., Appellants.

First Department, October 26, 2000

68

APPEARANCES OF COUNSEL

*Bernard E. Clair* of counsel (*Karen Golden* on the brief; *Rosenman & Colin, L. L. P.,* attorneys), for plaintiffs.

*Jay L.T. Breakstone* of counsel (*David H. Cohen* and *Ivan L. Tantleff* on the brief; *Tantleff, Cohen & Tantleff, P. C.*, and *The Breakstone Law Firm, P. C.*, attorneys), for defendants.

**OPINION OF THE COURT**

SAXE, J.

This appeal concerns a tragic mix-up at a fertility clinic through which a woman became a "gestational mother" to another couple's embryo, when the embryo was mistakenly implanted into the wrong woman's uterus. Since a determination of the issues presented may have far-ranging consequences, we attempt here to ensure that our holding is appropriately limited.

FACTS

In April 1998, plaintiffs Deborah Perry-Rogers and Robert Rogers began an in vitro fertilization and embryo transfer program with the In Vitro Fertility Center of New York. However, in the process, embryos consisting entirely of the Rogerses' genetic material were mistakenly implanted into the uterus of defendant Donna Fasano, along with embryos from Ms. Fasano's and her husband's genetic material. It is undisputed that on May 28, 1998 both couples were notified of the mistake and of the need for DNA and amniocentesis tests. The Rogerses further allege, and the Fasanos do not deny, that the Fasanos were unresponsive to the Rogerses' efforts to contact them.

On December 29, 1998, Donna Fasano gave birth to two male infants, of two different races. One, a white child, is concededly the Fasanos' biological child, named Vincent Fasano. The other, initially named Joseph Fasano, is a black child, who subsequent tests confirmed to be the Rogerses' biological son, now known as Akeil Richard Rogers.

The Fasanos took no action regarding the clinic's apparent error until the Rogerses, upon discovering that Ms. Fasano had given birth to a child who could be theirs, located and commenced an action against them.

PROCEDURAL HISTORY OF THE LITIGATION

On March 12, 1999, the Rogerses commenced a Supreme Court action against the Fasanos as well as the fertility clinic and its doctors. As against the medical defendants, the complaint alleged medical malpractice and breach of contract; as against the Fasanos, it sought a declaratory judgment declar-

ing the rights, obligations and relationships of the parties concerning Akeil.

On April 1 and April 2, 1999, DNA testing was conducted. The results of the test, issued on April 13, 1999, established that the Rogerses were the genetic parents of Akeil. However, according to Ms. Perry-Rogers, the Fasanos agreed to relinquish custody of Akeil to the Rogerses only upon the execution of a written agreement, which entitled the Fasanos to future visitation with Akeil. Ms. Perry-Rogers states that during the period between Akeil's birth on December 29, 1998 and May 10, 1999, the Fasanos only permitted her two brief visits with Akeil, and that she felt compelled to sign the agreement in order to gain custody of her son. The agreement, executed April 29, 1999, contains a visitation schedule providing for visits one full weekend per month, one weekend day each month, one week each summer, and alternating holidays. The agreement also contained a liquidated damages clause, providing that a violation of the Fasanos' visitation rights under the agreement would entitle them to $200,000.

On May 5, 1999 the Fasanos signed affidavits acknowledging that the Rogerses were the genetic parents of the infant, and consenting to the entry of a final order of custody of the child in favor of the Rogerses and to an amendment of the birth certificate naming the Rogerses as the biological and legal parents of the infant. On May 10, 1999, the Fasanos turned over custody of Akeil to the Rogerses, and the following day, May 11, 1999, counsel for the parties signed a stipulation discontinuing with prejudice the plenary action as against the Fasanos.

Despite the discontinuance, by order to show cause dated May 25, 1999, using the same index number of the plenary action, the Rogerses served a petition seeking a declaratory judgment against the Fasanos, naming the Rogerses as Akeil's legal and biological parents, granting them sole and exclusive custody, and permitting them to amend the birth certificate to reflect Akeil's biological heritage. Their application made no mention of the April 29, 1999 visitation agreement. The Fasanos submitted no opposition to the application, and the court granted the application without opposition in a decision dated June 7, 1999, directing settlement of an order.

The Fasanos then sought vacatur of the June 7, 1999 decision on the grounds that the Rogerses had failed to inform the court of the April 29, 1999 agreement, which they contended was a condition precedent to the signing of an order. The Fasanos proposed, in the alternative, a counterorder which specifically acknowledged the visitation agreement.

Although on July 16, 1999, the motion court signed the Rogerses' proposed order, which made no mention of the April 29, 1999 visitation agreement, at the same time the motion court "So Ordered" those paragraphs in the April 29, 1999 agreement which provided for visitation by the Fasanos.

The Rogerses assert that over the next few months, the IAS Court issued oral "visitation orders" in apparent reliance upon the visitation agreement, and directed that a full forensic psychological evaluation of the parties and their infants be conducted by two sets of mental health experts. On January 14, 2000, the IAS Court granted the Fasanos visitation with the child every other weekend.

The Rogerses now challenge the court's January 14, 2000 visitation order. For their part, the Fasanos appeal from the order of July 16, 1999 giving the Rogerses custody of the child, contending that in view of the discontinuance and the failure to thereafter properly commence a new custody proceeding, the court lacked jurisdiction as well as statutory authority to award custody.

### JURISDICTION AND PROCEDURAL OBJECTIONS

Initially, we deem the Fasanos to have waived their newly offered jurisdictional defense based upon the Rogerses' failure to procure a new index number and commence a new proceeding with their petition seeking an order of custody (*see*, *Kamar v City of New York*, 262 AD2d 57, 57-58). In any case, inasmuch as the new petition was not untimely, that failure may be corrected nunc pro tunc by the purchase of a new index number and the transfer of the submissions related to that matter to the new file (*id.*). The Supreme Court therefore had jurisdiction to make the custody order.

We also reject the Fasanos' contention that the court acted improperly in signing the Rogerses' proposed custody order because the Rogerses failed to mention the visitation agreement in their application. We do not consider the omission to constitute a failure of a condition precedent, and in any event, the Fasanos' June 21, 1999 order to show cause brought the visitation agreement to the attention of the court prior to the time it signed the Rogerses' proposed order.

### SUBJECT MATTER JURISDICTION AND STANDING

The Rogerses suggest that the Supreme Court lacks subject matter jurisdiction over this dispute because the Fasanos are "genetic strangers" to Akeil. We decline to dispose of

the Fasanos' claim on this basis alone. The Supreme Court of the State of New York has subject matter jurisdiction over petitions for custody and visitation pursuant to both the Domestic Relations Law and the Family Court Act.

This is not to say that the Fasanos necessarily have standing to seek visitation with Akeil. However, on this issue we will not simply adopt the Rogerses' suggestion that no gestational mother may ever claim visitation with the infant she carried, in view of her status as a "genetic stranger" to the infant. In recognition of current reproductive technology, the term "genetic stranger" alone can no longer be enough to end a discussion of this issue. Additional considerations may be relevant for an initial threshold analysis of who is, or may be, a "parent" (see, Hill, *What Does It Mean to Be a "Parent"? The Claims of Biology as the Basis for Parental Rights*, 66 NYU L Rev 353).

In referring to the rights and responsibilities of parents, the laws of this State, as well as the commentaries and case law, often use the term "natural parents," as distinguished from adoptive parents, stepparents, and foster parents (see, e.g., Domestic Relations Law §§ 24, 111, 115, 116, 117; Social Services Law § 384-b; *Matter of Carol Y. v David M.*, 150 AD2d 783). Until recently, there was no question as to who was a child's "natural" mother. It was the woman in whose uterus the child was conceived and borne (see, Stumpf, *Redefining Mother: A Legal Matrix for New Reproductive Technologies*, 96 Yale LJ 187).

It was only with the recent advent of in vitro fertilization technology that it became possible to divide between two women the functions that traditionally defined a mother, at least prenatally. With this technology, a troublesome legal dilemma has arisen: when one woman's fertilized eggs are implanted in another, which woman is the child's "natural" mother?

Although the technology is still fairly new, several cases have been decided that focus on competing claims to child custody arising out of the use of in vitro fertilization technology. These cases are not dispositive here, since visitation rights rather than custody is at issue. However, they contain analysis that provides important background for the issues raised on this appeal.

In *Johnson v Calvert* (5 Cal 4th 84, 851 P2d 776, *cert denied* 510 US 874), a surrogate mother, unrelated genetically to the child she had carried, declined to give the child to its genetic

parents upon its birth, as had been agreed in a surrogacy contract. While "recogniz[ing] both genetic consanguinity and giving birth as means of establishing a mother and child relationship," the California Supreme Court concluded that "when the two means do not coincide in one woman, she who intended to procreate the child—that is, she who intended to bring about the birth of a child that she intended to raise as her own—is the natural mother under California law." (5 Cal 4th, at 93, 851 P2d, at 782.) It therefore affirmed an award of custody to the genetic parents.

The Second Department applied this "intent" analysis to the converse situation, to recognize the parental rights of a gestational mother who had carried a fetus created from the egg of an anonymous donor which was fertilized with her husband's sperm (see, McDonald v McDonald, 196 AD2d 7). The Court rejected the father's position, in the context of a divorce proceeding, that as "the 'only genetic and natural parent available,'" his claim to custody was superior to that of his wife, and held that the gestational mother was legally the mother of the child to whom she had given birth (id., at 9, 12).

While the foregoing cases are not directly on point, since they deal with a gestational, nongenetic mother's asserted right to be regarded as the infant's sole natural mother, a claim for visitation by a gestational mother and her family also requires examination and clarification of their legal relationship to the child.

It is apparent from the foregoing cases that a "gestational mother" may possess enforceable rights under the law, despite her being a "genetic stranger" to the child. Given the complex possibilities in these kind of circumstances, it is simply inappropriate to render any determination solely as a consequence of genetics.

Parenthetically, it is worth noting that even if the Fasanos had claimed the right to custody of the child, application of the "intent" analysis suggested in Professor Hill's article (id.), and employed in Johnson v Calvert (supra) and McDonald v McDonald (supra) would—in our view—require that custody be awarded to the Rogerses. It was they who purposefully arranged for their genetic material to be taken and used in order to attempt to create their own child, whom they intended to rear.

### STANDING TO SEEK VISITATION

To establish their claim that the Fasanos lack standing, the Rogerses focus upon the strict limits of New York statutory

and case law regarding who may seek visitation. Under New York statutory law, the only people who have the right to seek visitation are parents (Domestic Relations Law §§ 70, 240), grandparents (Domestic Relations Law §§ 72, 240) and siblings related by whole or half-blood (Domestic Relations Law § 71). The Rogerses rely on the proposition that because the statutes must be strictly construed, they must be interpreted to preclude the Fasanos from within their framework. Specifically, they suggest that by their act of ceding Akeil to the Rogerses, the child's genetic parents, the Fasanos have surrendered any conceivable right to the parental status necessary to claim visitation rights.

We agree that under the circumstances presented, the Fasanos lack standing under Domestic Relations Law § 70 to seek visitation as the child's parents. However, this is not because we necessarily accept the broad premise that in *any* situation where a parent, possessed of that status by virtue of having borne and given birth to the child, acknowledges another couple's entitlement to the status of parent by virtue of their having provided the genetic materials that created the child, the birth parent automatically gives up all parental rights.[1]

Rather, we recognize that in these rather unique circumstances, where the Rogerses' embryo was implanted in Donna Fasano by mistake, and where the Fasanos knew of the error not long after it occurred, the happenstance of the Fasanos' nominal parenthood over Akeil should have been treated as a mistake to be corrected at soon as possible, *before the development of a parental relationship*. It bears more similarity to a mix-up at the time of a hospital's discharge of two newborn infants, which should simply be corrected at once,[2] than to one where a gestational mother has arguably the same rights to

---

**1.** Despite the longstanding tradition that a child cannot have more than one mother and one father at a time, some exceptions to that firm rule have recently begun to develop. For instance, it is now possible for both parties in a lesbian couple to be a child's mother (*see, Matter of Jacob,* 86 NY2d 651). It is also possible for a parent to assert rights to continuing visitation despite having given a child up for adoption (*see,* Social Services Law § 383-c; *Matter of Gregory B.,* 74 NY2d 77, 91). It is certainly conceivable that under some other circumstances, we would have to treat both genetic and gestational mother as parents, at least for certain purposes.

**2.** If a hospital mix-up is discovered right away, there should be no question that it must be corrected at once; although, in circumstances where years have passed before the error is discovered, courts might consider some arrangement other than a simple change of custody (*compare, Twigg v Mays,* 1993 WL 330624 [Fl Cir Ct, Aug. 18, 1993, No. 88-4489-CA-01 [switch discovered after 10 years, change of custody denied]; *Pope v Moore,* 261 Ga

claim parentage as the genetic mother. Under such circumstances, the Fasanos will not be heard to claim the status of parents, entitled to seek an award of visitation.

Additionally, the Fasanos' child, Vincent, is not a sibling "by half or whole blood" with the right to proceed under Domestic Relations Law § 71, since the statute makes no reference to "gestational siblings."

In addition to the absence of statutory support for the Fasanos' visitation application, the policy underlying two important visitation cases in this State (*see, Matter of Alison D. v Virginia M.*, 77 NY2d 651; *Matter of Ronald FF. v Cindy GG.*, 70 NY2d 141) militates against their position as well. Even though, as we have noted, it is inaccurate to refer to a child's gestational mother as a "biological stranger," the strong policy considerations behind these cases, in which the Court considered visitation claims by "biological strangers," apply here. Where a child is properly in the custody of parents, it has been repeatedly held, those parents are accorded extremely broad rights to exclude any visitation, *even by a person who has raised and nurtured the child as his or her own* (*see, Matter of Alison D. v Virginia M., supra; Matter of Ronald FF. v Cindy GG., supra*).

### APPLICABILITY OF A "BEST INTERESTS" APPROACH

■ The Fasanos argue that determination at this point of the parties' respective rights regarding Akeil would be premature, in view of the preliminary procedural posture of this case. Indeed, there has been neither testimony nor even joinder of issue. Nevertheless, in this instance, we conclude that a determination on the law may, and indeed must, be made at this time. While there may well be occasions where a dispute between gestational and genetic parents requires a full evidentiary "best interests" hearing to ensure that the child's interests are fully protected, this is *not* such a case.

The only facts needed for this determination are those that are clearly established on this meager record: (1) plaintiffs are the genetic parents of the child, Akeil Rogers, and are concededly entitled to custody of him; (2) defendant Donna Fasano is the child's "gestational mother," having given birth to him after being implanted by mistake with the fertilized embryo of

253, 403 SE2d 205 [1991] [mistake discovered after four years, genetic mother awarded visitation, denied custody]; *see generally,* Note, *What's Best for Babies Switched at Birth? The Role of the Court, Rights of Non-biological Parents, and Mandatory Mediation of the Custodial Agreements,* 21 Whittier L Rev 315).

plaintiffs, (3) the parties were made aware of the mistake by the medical facility prior to the birth of the child, and (4) in the process of working out the transfer of Akeil to plaintiffs, the Fasanos and the Rogerses entered into an agreement providing for visitation.

In other circumstances, inquiry may be appropriate as to whether a psychological bond exists which should not be abruptly severed, and if so, what living arrangements would be in the child's best interests. For instance, when a child has been born into and raised as a part of a family for an extended period of time, a basis may be presented for directing custody with one family and visitation to another.

We are also cognizant that a bond may well develop between a gestational mother and the infant she carried, before, during and immediately after the birth (*see, e.g.,* Noble-Allgire, *Switched at the Fertility Clinic: Determining Maternal Rights When a Child is Born from Stolen or Misdelivered Genetic Material,* 64 Mo L Rev 517 [Summer 1999]), and that indeed, here, the parties' visitation agreement itself proclaimed the existence of a bond between the two infants. Nevertheless, the suggested existence of a bond is not enough under the present circumstances.

In the present case, any bonding on the part of Akeil to his gestational mother and her family was the direct result of the Fasanos' failure to take timely action upon being informed of the clinic's admitted error. Defendants cannot be permitted to purposefully act in such as way as to create a bond, and then rely upon it for their assertion of rights to which they would not otherwise be entitled.

Nor may the parties' visitation agreement form the basis for a court order of visitation. "[A] voluntary agreement * * * will not of itself confer standing upon a person not related by blood to assert a legal claim to visitation or custody" (*Matter of Cindy P. v Danny P.,* 206 AD2d 615, 616, *lv denied* 84 NY2d 808; *see also, Matter of Canabush v Wancewicz,* 193 AD2d 260).

Finally, the circumstances presented, tragic as they are, do not form the basis for application of the doctrine of equitable estoppel to prevent the Rogerses from challenging the Fasanos' standing to seek visitation (*compare, Matter of Gilbert A. v Laura A.,* 261 AD2d 886 [years after divorce, mother sought to deny former husband visitation rights with child born during marriage, asserting—with proof—that a third party was the child's biological father; former husband found entitled to present proof as to whether mother should be equi-

tably estopped from denying his paternal rights]; *Matter of Christopher S. v Ann Marie S.*, 173 Misc 2d 824 [child's former stepfather sought custody, mother estopped from challenging his standing where she had told the child that his stepfather was his father, and acted as such in all other respects]; *Matter of J.C. v C.T.*, NYLJ, June 23, 2000, at 33, col 3 [Fam Court, Westchester County] [hearing directed as to whether petitioner, former domestic partner, seeking visitation with respondent's children, should be allowed to invoke the doctrine of equitable estoppel, due to her own actions in creating, nurturing and encouraging a parent-child relationship with the nonbiological "parent"]).

Accordingly, the order of the Supreme Court, New York County (Diane Lebedeff, J.), entered February 2, 2000, which granted defendants visitation with the infant Joseph Fasano, now known as Akeil Richard Rogers, should be reversed, on the law, without costs, and the application for an order of visitation denied. Order, Supreme Court, New York County (Diane Lebedeff, J.), entered September 2, 1999, which declared the Rogerses to be the parents of the infant, should be modified, on the law, to the extent of ordering the Rogerses to purchase a new index number for their special proceeding and thereupon transferring the relevant documents nunc pro tunc to that new file, and otherwise affirmed, without costs.

WILLIAMS, J. P., TOM, ELLERIN and ANDRIAS, JJ., concur.

Order, Supreme Court, New York County, entered February 2, 2000, reversed, on the law, without costs, and the application for an order of visitation denied. Order, same court, entered September 2, 1999, modified, on the law, to the extent of ordering the plaintiffs to purchase a new index number for their special proceeding and thereupon transferring the relevant documents nunc pro tunc to that new file, and otherwise affirmed, without costs.