*568 OPINION OF THE COURT
Kristin Booth Glen, S.
This case presents important questions about the ways in which a child’s “parents” are defined and legally constituted, and how the parent-child relationship can be protected in a transient, cross-border society. Answers implicate assisted reproductive technologies (ARTs) and an outdated statutory scheme which fails to anticipate the relations created by those technologies, New York’s evolving jurisprudence of same-sex relationships, equal protection, full faith and credit, and the effects of the federal Defense of Marriage Act (DOMA) (1 USC § 7; 28 USC § 1738C, as added by Pub L 104-199, 110 US Stat 2419 [1996]). This court concludes that although petitioner already has a legally protected parental relationship with Sebastian and, even in the absence of that legal relationship, could utilize several less intrusive, expensive and time-consuming methods of establishing one, the only remedy available here that will accord the parties full and unassailable protection is a second parent adoption pursuant to Domestic Relations Law § 111 et.seq.
Facts
Ingrid A. is a Dutch citizen who works at the United Nations. Mona A. is of Somali/Yemeni heritage, had an international upbringing and practices international law at a New York firm. Ingrid and Mona have been in a committed relationship for more than 11 years, and on December 24, 2004 they were legally married in the Netherlands.[1] Desirous of establishing a family, and one which would reflect their ethnic and racial diversity, Mona donated her ova which were fertilized in vitro[2] by an anonymous sperm donor chosen for his similarities to Ingrid’s *569 Dutch-Italian ethnicity. The fertilized ovum was successfully implanted in Ingrid’s uterus, and in January 2008 she gave birth to Sebastian, with Mona at her side. A birth certificate was issued by New York City’s Department of Health and Mental Hygiene naming Ingrid alone as Sebastian’s parent. Since then, Ingrid and Mona continue to live together and co-parent Sebastian, who they consider to be the child of each of them. Notwithstanding their marriage and Mona’s unquestioned genetic relationship to Sebastian, Mona here seeks to adopt the child.
Background
I. The Law of Parentage
At common law, parentage* *[3] derived from two events, a child’s birth to its “mother,” and the mother’s marriage to a man. Children born out of wedlock had only one legal parent, their birth mother. Recognizing the many advantages that flowed to children from having two parents, legislatures enacted filiation or paternity proceedings to confer legal parentage on nonmarital biological/genetic fathers (see e.g. Hough v Light, 275 App Div 299 [1st Dept 1949]), a status which carries support and other obligations (Family Ct Act § 513). Similarly, adoption statutes established legal parentage for married couples who were biological/genetic strangers to a child (Domestic Relations Law § 110). Adoption also permitted an unrelated person, married to a child’s mother or father subsequent to the child’s birth, to attain “parental” rights, rather than functioning only as a stepparent. Over time, by legislative action and/or judicial construction, adoption became available to unmarried same-sex couples (Matter of Jacob, 86 NY2d 651 [1995]). The legislative purpose behind all these expansions of parentage has consistently been the best interests of the child, both economic (see e.g. Matter of L. Pamela P. v Frank S., 59 NY2d 1 [1983]) and psychological (e.g. Matter of Jacob, 86 NY2d at 658-659).
*570 At the same time that statutorily created and defined parentage expanded, so also did ARTs unknown to the common law and unanticipated by legislatures that created adoption and filiation statutes (see e.g. Ami Jaeger, Parentage Issues in ARTS, in 2 Child Custody and Visitation Law and Practice § 11 A.03 [1983]). A child now may be the product of an ovum from one woman (the genetic mother) fertilized by the sperm of a man (the genetic father) who is or is not married to the woman who actually bears the child (the gestational mother). Where the gestational mother, who may also be the genetic mother, is married, her husband is deemed to be the child’s father whether or not he is the genetic father (see e.g. John Lawrence Hill, What Does It Mean to be a “Parent”? The Claims of Biology as the Basis for Parental Rights, 66 NYU L Rev 353, 372-373 [1991]).[4]
These physiological possibilities, combined with the inadequacy of preexisting legal frameworks, have generated a vast and confusing landscape involving controversies over “surrogacy,”[5] 6“ownership” rights to frozen embryos (Kass v Kass, 91 NY2d 554 [1998]), fertility clinic errors (Perry-Rogers v Fasano, 276 AD2d 67 [1st Dept 2000]), and custody and visitation disputes between genetic and gestational mothers (e.g. K.M. v E.G., 37 Cal 4th 130, 117 P3d 673 [2005], supra [previously cohabiting domestic partners]; Johnson v Calvert,[6] 5 Cal 4th 84, 851 P2d 776 [1993] [wife whose ovum was fertilized in *571 vitro by her husband’s sperm then implanted in surrogate/ gestational mother], cert denied 510 US 874 [1993]).
At present, there is no clear law in New York determining the relationship between a child and various women who may lay claim to parentage through a genetic or gestational relationship.[7] And, of special significance, no reported decision, in this state or other states, has discussed or determined the parentage of a child’s gestational and genetic mothers in a proceeding which involves no dispute between the parties.
II. Adoption
Adoption has been generally described as follows:
“Adoptive families are the product of law, not blood. Through a highly regulated process culminating in a judicial proceeding, the state creates the status of parent and child ‘in all respects’ between individuals who are not biogenetically related and severs the child’s legal relationship to the biogenetic parents and their families. Once an adoption decree has been issued, the adoptive family replaces and becomes the legal equivalent of the biogenetic family. The adoptee receives a new birth certificate with the names of her adoptive parents substituted for the names of the woman and man, if any, listed as her parents at birth.” (Naomi R. Cahn and Joan Heifetz Hollinger, Families by Law: An Adoption Reader, at 1 [NY Univ Press 2004].)
In New York, adoption creates a legal parent-child relationship where none previously existed.[8] Because the adoption statute is in derogation of the common law, it is to be strictly
*572 construed (Matter of Robert Paul P., 63 NY2d 233 [1984]). Although the statute has been judicially extended to permit adoption by unmarried couples[9] including same-sex couples (Matter of Jacob, 86 NY2d 651 [1995]), its purpose and effect is to create a new legal relationship where one did not previously exist. Adoption is not utilized for, nor, with one exception,[10] is it available to reaffirm, an already existing parent-child relationship (see Matter of Adoption Petition of C.C., Cal Super Ct, Sept. 12, 1997, No. A 19833, cited in Ryiah Lilith, The G.I.F.T. of Two Biological and Legal Mothers, 9 Am U J Gender Soc Pol’y & L 207, 216 [2001]).[11]
The question, then, is whether adoption is appropriate and/or permitted where, as here, the party petitioning for adoption was legally married to the child’s mother at the time of the child’s conception and birth, and where she is also the child’s genetic mother.
Discussion
I. Marriage as Basis for Parentage
A. New York’s Recognition of Foreign Marriage
Ingrid and Mona were legally married in the Netherlands, and under general marriage-recognition rules,[12] that marriage is recognized in New York (Martinez v County of Monroe, 50 AD3d 189 [4th Dept 2008], lv dismissed 10 NY3d 856 [2008]; C.M. v *573 C.C., 21 Misc 3d 926 [Sup Ct, NY County 2008] [recognizing out-of-state marriage for the purpose of divorce action]). In addition to judicial recognition, New York’s executive branch has acted to extend full protection to same-sex couples validly married in other jurisdictions (see Mem from David Nocenti, Counsel to the Governor, to All Agency Counsel, RE: Martinez Decision on Same-Sex Marriages [May 14, 2008] [noting that “extension of . . . recognition (found in Martinez) is consistent with State policy” and directing state agencies to conform their policies and regulations]).[13] Thus, as the child of a married couple, Sebastian already has a recognized and protected child-parent relationship with both Ingrid and Mona, arguably making adoption unnecessary and impermissibly duplicative.
Unfortunately, while this is the case in New York, the same recognition and protection of Mona’s parental rights does not currently exist in the rest of this country, or in most other nations in the world. For this reason, the parties argue that only an order of adoption would ensure the portability of Sebastian’s parentage, and further ensure that the federal government[14] and other states would recognize Mona as Sebastian’s legal parent.[15]
*574 B. Exception to the Presumption, DOMA, and Full Faith and Credit
Even under a traditional choice of law analysis, a marriage validly contracted in another state need not be accorded recognition if that marriage runs afoul of the forum state’s public policy (see Martinez, 50 AD3d at 192; Restatement [Second] of Conflict of Laws: Validity of Marriage § 283).
Currently there are explicit prohibitions against same-sex marriages in 44 states;[16] 29 of those states have passed constitutional amendments restricting marriage to one man and one woman,[17] while 15 states prohibit same-sex marriage by statute.[18] Without a change in these laws,[19] or an unlikely expansion of the Full Faith and Credit Clause[20] jurisprudence (US Const, art IV^ § 1; see Developments in the Law — The Law of Marriage and Family: Constitutional Constraints on Interstate Same-Sex Marriage Recognition, 116 Harv L Rev 2028, 2051 *575 [2003][21] [.Developments in the Law]), these clear legislative statements of public policy would appear to permit courts of those states to deny recognition of same-sex marriages contracted elsewhere, and, arguably, also to legal rights flowing from those marriages, including presumptive parenthood.
Such a position is supported by DOMA, a 1996 congressional enactment that not only defines marriage as solely a relationship between a man and a woman,[22] but also appears to allow the states to deny recognition of same-sex marriages validly contracted elsewhere.[23] To date, there is little case law on the validity or effect of the state DOMAs, or the constitutionality of the federal DOMA.[24]
A holding by this court that Mona is already a legal parent by virtue of a foreign marriage recognized in this state may therefore offer insufficient protection in other states (see Finstuen v Crutcher, 496 F3d 1139, 1153-1154 [10th Cir 2007] [holding that although a court is required to recognize the valid judgments of another state court, it is not bound by another state’s court’s statutory interpretations]), just as DOMA itself precludes federal benefits based on marital status to same-sex couples. Thus, unless there is some other basis, grounded on genetic connection, upon which Mona’s parentage of Sebastian can be legally established, adoption is the sole means by which their parent-child relationship and the “rights and obligations incident thereto” can be fully protected.
*576 II. Amended Birth Certificate as Basis for Parentage
An important consequence of adoption is the issuance of a new birth certificate, substituting the adoptive parent(s) for the birth mother and, if known and recorded, the genetic father (Public Health Law § 4138 [1] [c]).
In the context of gestational surrogacy, at least one New York court has ordered that a new birth certificate issue naming the genetic mother and her husband, the genetic father, in lieu of the gestational mother (Doe v New York City Bd. of Health, 5 Misc 3d 424 [Sup Ct, NY County 2004];[25] see also Arredondo v Nodelman, 163 Misc 2d 757 [Sup Ct, Queens County 1994]). In accordance with the May 14, 2008 executive order (supra), the State Department of Health is now issuing birth certificates to same-sex couples validly married elsewhere showing both marital partners as the parents of children born to the marriage in New York (see New York State Dept Mem, Series 631.0, Recognizing Same-Sex Marriages Performed Legally in Other Jurisdictions [Dec. 8, 2008]) as is the New York City Department of Health (see City Eases Rule for Lesbian Moms, Newsday, Mar. 26, 2009, section A, at 24). This recognition should also be available to Ingrid and Mona, albeit retroactively.
A birth certificate is, however, only prima facie evidence of parentage (Public Health Law § 4103) and does not, in and of itself, confer parental rights that must be recognized elsewhere. Accordingly, although the parties here may obtain a new birth certificate by virtue of their marriage, that birth certificate alone, without some judicial determination of Mona’s parentage[26] would provide insufficient protection of Mona’s parental rights.
III. Biogenetic Bases for Parentage
No New York statute deals directly with the issue presented here: whether the law should recognize both parties in a committed lesbian relationship[27] — one of whom is the gestational mother, and the other of whom is the genetic mother of a child — as the child’s legal parents without the necessity of an *577 adoption. There is little statutory law directed at ARTs, and then only in the context of artificial insemination (Domestic Relations Law § 73 [severing any rights or responsibilities of an anonymous sperm donor and conferring paternal rights on the consenting husband of a woman inseminated by a doctor]) or gestational surrogacy (Domestic Relations Law § 122 [making parties’ agreements to sever maternal rights of a gestational mother illegal]).
There is, however, substantial law on genetic parentage, denominated “paternity,” including both judicial filiation proceedings under Family Court Act article 5, and the simplified acknowledgment proceedings of Family Court Act § 516-a and Social Services Law § 111-k or Public Health Law § 4135-b. Subjected to equal protection analysis under both the state and federal constitutions,[28] these existing laws provide a potential means for resolving the instant issue, even in the absence of more specific action by the legislature.[29]
A. Paternity/Filiation Proceedings[30] The parentage of a child born out of wedlock is typically established through paternity proceedings, governed by article 5 of the Family Court Act.[31] The proceedings are commenced by a petition (Family Ct Act § 523), and require a hearing at which
*578 “[t]he mother or the alleged father shall be competent to testify but the respondent shall not be compelled to testify” (Family Ct Act § 531). If the proceeding is contested, DNA or other genetic marker tests may be ordered, and the results of such test(s) are admissible in evidence (Family Ct Act § 532; see also Matter of Department of Social Servs. v Thomas J. S., 100 AD2d 119 [2d Dept 1984] [upholding use of the tests against a self-incrimination claim]). Such tests are not, however, necessary where paternity has been conceded, explicitly or implicitly (see Wilson v Lumb, 181 Misc 2d 1033 [Sup Ct, St. Lawrence County 1999]). If the court finds the male respondent to be the father of the child, it makes “an order of filiation, declaring paternity” (Family Ct Act § 542 [a]), which order is then transmitted to the appropriate officials so that a new birth certificate may be issued (Family Ct Act § 543; Public Health Law § 4138 [1] [b]). The court may also, if necessary, make an order of support (Family Ct Act § 545), and/or of visitation (Family Ct Act § 549).
B. Acknowledgment of Paternity There is an even simpler procedure available to unmarried parents who both agree as to the man’s parentage,[32] The mother and putative father may execute an acknowledgment of paternity, either immediately preceding or following the in-hospital birth of the child[33] (Public Health Law § 4135-b [1] [a]), or subsequently (Social Services Law § 111-k), in accordance with the formalities enumerated in the relevant statutory provision[34] (Family Ct Act § 516-a). After filing the acknowledgment, a new birth certificate issues showing the birth mother and *579 (former) putative father as the child’s “natural” parents (Public Health Law § 4138 [1] [e]).
C. Equal Protection
The equal protection analysis here rests, as a threshold matter, on a relatively recent body of case law that has established some basic principles, unknown to and perhaps unimagined by the legislators who enacted the relevant provisions of the Family Court Act, Public Health Law and Social Services Law. First, and most critical, is the premise, endorsed by the Court of Appeals in Matter of Jacob (86 NY2d 651 [1995], supra) that a child’s legal parents may be of the. same sex, that is, rather than one mother and one father, a child may have two mothers, or two fathers[35] (see also Perry-Rogers v Fasano, 276 AD2d 67, 74 n 1 [1st Dept 2000] [“under some . . . circumstances, we would have to treat both genetic and gestational mother as parents . . . ”]). Following second parent adoptions, both parents, albeit of the same sex, are listed on the new birth certificate;[36] similarly, a recent executive order requires that birth certificates of children born in New York to a same-sex couple validly married elsewhere list both parties to the marriage as parents (see Mem from David Nocenti, Counsel to the Governor, to All Agency Counsel, RE: Martinez Decision on Same-Sex Marriages [May 14, 2008]). Thus, in New York, there is no legal impediment to recognizing the parentage of two mothers.
Decisions in this and other states have also established the principle that, in cases involving ARTs, the legally recognized state of “motherhood” can derive from (1) gestation (see e.g. McDonald v McDonald, 196 AD2d 7 [2d Dept 1994] [wife who was gestational mother was the “natural mother”]); (2) genetics (Doe v New York City Bd. of Health, 5 Misc 3d 424, 427 [Sup Ct, NY County 2004] [granting an “order of maternity” to a genetic mother and directing issuance of a second birth certificate reflecting that determination]; Culliton v Beth Israel Deaconess *580 Med. Ctr., 435 Mass 285, 756 NE2d 1133 [2001];[37] Arredondo, 163 Misc 2d 757 [1994] [declaring genetic mother the legal mother and directing City to issue new birth record to reflect that fact]; Belsito v Clark, 67 Ohio Misc 2d 54, 644 NE2d 760 [Ct Common Pleas 1994]); or (3) both (see e.g. K.M. v E.G., 37 Cal 4th 130, 117 P3d 673 [2005], supra).
Examined in light of these developments, the guarantee of constitutional equal protection, discussed below, sharply presents the question: why should an unmarried man who is genetically related to, and who has established a parental relationship with a child[38] be permitted to establish legally protected and recognized rights of parentage through statutory acknowledgment or filiation proceedings when a similarly situated[39] woman cannot? Or, put another way, why shouldn’t the lesbian genetic mother of a child born to her partner be permitted to utilize either of the existing statutory paternity procedures to establish her parentage status and rights, rather than being limited to the more expensive, time-consuming and intrusive[40] adoption mechanism?
*581 D. The Constitutional Standard
Under both the state[41] and federal constitutions, equal protection requires that gender-based classifications be subject to “heightened scrutiny” (People v Liberta, 64 NY2d 152 [1984]; e.g. Mississippi Univ. for Women v Hogan, 458 US 718, 725-726 [1982] ; Craig v Boren, 429 US 190, 197 [1976]). That is, they must serve “important governmental objectives” and “the discriminatory means employed [must be] substantially related to the achievement of those objectives” (United States v Virginia, 518 US 515, 533 [1996] [internal quotation marks omitted]; People v Liberta, 64 NY2d at 168).
Applying these principles to New York’s statutory scheme, it is clear that provisions permitting the biological (“putative”) father of a child born out of wedlock to establish parental status while excluding the genetic mother from the same opportunity is a constitutionally prohibited gender-based classification. The governmental interest underlying New York’s paternity laws— which themselves abrogated common law affording legal parentage only to men married to a child’s mother — is to protect the welfare of the “illegitimate child” by assigning support obligations to a second person biologically connected to the child[42] (see Matter of L. Pamela P. v Frank S., 59 NY2d 1, 5 [1983] ).[43]
That is, in essence, the same governmental interest cited in Matter of Jacob to permit adoptions by same-sex couples (see *582 Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 110, at 26 [1999 ed]). And even as the Court in Jacob did not distinguish between potential adoptive parents based on their gender/sexual orientation, there is no rational, much less compelling, reason to discriminate between male and female genetic parents who seek to use New York’s statutory paternity laws to establish parental rights, as well as corresponding responsibilities, to their children.[44]
Having established impermissible gender-based discrimination, the question becomes what should be done with the overtly discriminatory (paternity) statutes. Where a statute’s gender classification fails to meet the heightened scrutiny standard, courts have several choices: they may construe the statute in a way that avoids constitutional infirmity (People v Barber, 289 NY 378, 385 [1943] [a “statute should be construed when possible in (a) manner which would remove doubt of its constitutionality”]; Matter of Rochelle L. v Bruce M., 89 AD2d 765 [3d Dept 1982] [substituting gender neutral language in Family Ct Act § 532 to avoid constitutional infirmity]; Matter of Lisa M. UU. v Mario D. VV., 78 AD2d 711 [3d Dept 1980] [reading Family Ct Act § 514 as gender neutral to preserve constitutionality]), or they may declare relevant parts of the statute unconstitutional. Where the constitutional defect is due to underinclusion, “a court may either strike the statute, and thus make it applicable to nobody, or extend the coverage of the statute to those formerly excluded” (People v Liberta at 170). The choice depends on what the court believes the legislature would have done if it had “foreseen” the underinclusiveness (Matter of Westinghouse Elec. Corp. v Tully, 63 NY2d 191, 196 [1984]).
*583 To the extent it is possible to predict what the legislature would have done if it had foreseen the underinclusiveness of the paternity statutes, it seems apparent that it would have extended those statutes to genetic mothers. Although the legislature has not yet legalized same-sex marriage, given the undeniable legislative purpose of paternity and filiation proceedings to provide two parents, and two sources of support for children born out of wedlock, it is inconceivable that the legislature would decline to provide those same protections just because the second, genetically related parent is a woman, not a man.[45]
Chief Judge Kaye’s opinion in Matter of Jacob is illustrative. Construing an unclear statute to ensure its constitutionality, she wrote:
“[A] construction of [Domestic Relations Law § 117] that would deny children [like those whose second parent adoptions were under review] the opportunity of having their two de facto parents become their legal parents, based solely on their biological mother’s sexual orientation . . . would not only be unjust under the circumstances, but also might raise constitutional concerns in light of the adoption statute’s historically consistent purpose — the best interests of the child.” (86 NY2d at 667 [citations omitted].)
So too here, the consistent purpose of serving children’s best interests by providing them with two responsible parents, rather than one, requires that paternity proceedings and acknowledgment of paternity should be made available to lesbian genetic co-mothers.
Although New York has not adopted the Uniform Parentage Act (UPA) ([2000] §§ 101-905, ULA Parentage §§ 101-905; [1973] §§ 1-30, ULA Parentage §§ 1-30),[46] that model statute provides additional support for extending the availability of paternity proceedings to genetic mothers (see UPA [2000] § 106). *584 UPA (2000) § 201 presumptively designates a child’s gestational mother as her legal mother, but also allows for establishment of a legally recognized parental relationship by a genetic mother (see Belsito, 67 Ohio Misc 2d 54, 644 NE2d 760 [interpreting Ohio’s UPA]; Ryiah Lilith, The G.I.F.T. of Two Biological and Legal Mothers, 9 Am U J Gender Soc Pol’y & L 207, 235 [2001]). The UPA does not, itself, provide procedures for determining “maternity” other than by gestation,[47] but contains several provisions by which a man can establish paternity, including through proof of genetic parentage (UPA [2000] art 5; UPA [1973] § 12).[48] Significantly, UPA (2000) § 106 and UPA (1973) § 21 state that any relevant sections of the UPA, presumably including UPA (2000) § 204 and UPA (1973) § 4 (a), can be applied to establish maternity as well[49] (Ryiah Lilith, The G.I.F.T. of Two Biological and Legal Mothers, 9 Am U J Gender Soc Pol’y & L 207 [2001]). So, also, should New York’s existing procedures for establishing paternity be available for determination of the legal parenthood of a genetic mother.
IV Full Faith and Credit for Adoption The parties’ argument for an adoption here is based on their desire to have a determination of parentage that will be recognized everywhere, as opposed to one that other jurisdictions may be free to disregard. Although there is no Supreme Court decision on point, federal courts that have considered the issue have held that a judicial order of adoption in one state must be afforded full faith and credit in every other state, and that there can be no “public policy” exception to that mandatory recognition (Finstuen at 1152-1153; Adar v Smith, 591 F Supp 2d 857, 861-862 [ED La 2008]). That is also the view of most commentators (see e.g. Rhonda Wasserman, Are You Still My Mother ?: Interstate Recognition of Adoptions by Gays and Lesbians, 58 Am U L Rev 1 [2008]; Barbara J. Cox, Adoptions by Lesbian and Gay Parents Must be Recognized by Sister States under the Full Faith and Credit Clause Despite Anti-Marriage Statutes That Discriminate against Same-Sex Couples, 31 Cap U L Rev 751 [2003]; Hollinger et al., 1 Adoption Law and *585 Practice § 3.06 [6] [2008]; Scoles et al., Conflict of Laws § 16.6, at 703 [4th ed 2004]).
Assuming that New York’s statutory paternity proceedings are available to Mona because of the requirements of equal protection,[50] the question is whether either an order of filiation or an acknowledgment of paternity would afford Mona — and, of course, Sebastian — a legally recognized parental relationship outside this state’s borders.
On its face, for full faith and credit purposes, a judicial order of filiation should produce the same result as an adoption.[51] In contrast, an “acknowledgment of paternity” would facially appear to offer no protection under the Full Faith and Credit Clause, since it is not a judgment, order or decree, nor is it the result of “judicial proceedings.” However, the Public Health Law specifically provides, “[a]n acknowledgment of paternity executed by the mother and father of a child born out of wedlock shall establish the paternity of a child and shall have the same force and effect as an order of paternity or filiation issued by a court of competent jurisdiction” (Public Health Law § 4135-b [3] [a] [emphasis added]).
Moreover, federal law requires states receiving federal funding for child support collection to grant full faith and credit to acknowledgments of paternity from other states that comply with the requirements of title IY part D, of the Social Security Act (42 USC, ch 7, § 666 [a] [1]-[10];[52] see also 45 CFR 302.70 [a] [9] [ii]). At present, all states have enacted provisions,[53] like New York’s Family Court Act § 571 (11), containing a full faith and credit provision. However, extension of New York’s paternity acknowledgment to genetic mothers would depend on construction of the statute by courts of this state; other states *586 would be free to take a contrary view, such that reliance on the federal statutory guarantee offers no absolute guarantee of recognition to Mona and Sebastian. Nor would the Full Faith and Credit Clause itself require recognition without a public policy exception[54] since it does not apply to a state court’s construction of its own statutes (Finstuen, 496 F3d 1139 [2007]).
If certainty is what the parties want, and Sebastian needs, reliance on a gender neutral acknowledgment of paternity may not provide all the protection available either from a judicial filiation proceeding or the second parent adoption requested here.
V Jurisdiction
The Family Court Act grants “exclusive original jurisdiction” over “proceedings to establish paternity” to the Family Court, but also provides that “[i]n accordance with the provisions of section one hundred eleven-b of the domestic relations law, the surrogate’s court has original jurisdiction concurrent with the family court to determine the issues relating to the establishment of paternity” (Family Ct Act § 511 [emphasis added]).
This rather opaque distinction is somewhat clarified by the language of Domestic Relations Law § 111-b, which permits surrogates “to determine any issue of paternity arising in the course of [an adoption] proceeding and to make findings and issue an order thereon” (Domestic Relations Law § 111-b [1]). The surrogate is expressly prohibited from granting any relief “relating to support of the child” incident to a determination of paternity (Domestic Relations Law § 111-b [2]); as the section concludes: “A judge of the family court shall continue to exercise all of the powers relating to adoption and declaration of paternity conferred upon the family court by law” (Domestic Relations Law § 111-b [3] [emphasis added]).
Thus it appears that this court could “determine parentage” under a constitutional, gender neutral reading of the paternity laws, but only “in the course of [an adoption] proceeding.” Even then, it is unclear whether a surrogate could make a “declaration” of parentage that is the equivalent of an article 5 Family Court judgment. There is, however, little practical effect, *587 even were jurisdiction most broadly construed,[55] since all the disadvantages of the adoption proceeding necessarily attend any exercise of this court’s power.
Conclusion
Sebastian’s genetic mother has other potential legal avenues: first, to be listed on Sebastian’s birth certificate; second, with her partner, Ingrid, to execute a statutorily prescribed acknowledgment of paternity (filiation); and third, to obtain a judicial order of filiation. Only the last of these is presumptively subject to full faith and credit. This court, however, lacks jurisdiction to confer legal parentage in any way other than by granting the adoption requested by the parties. And, although it is also true that an adoption should be unnecessary because Sebastian was born to parents whose marriage is legally recognized in this state, the best interests of this child require a judgment that will ensure recognition of both Ingrid and Mona as his legal parents throughout the entire United States.
Mona’s petition to adopt Sebastian is, therefore, granted, and, as a matter of law, in addition to her own genetic and loving connection, she is accorded all the rights and responsibilities appurtenant to the relationship of parent to her son Sebastian.

. In 2001, the Netherlands became the first country in the world to allow same-sex marriage (see Masha Antokolskaia and Katharina Boele-Woelki, Dutch Family Law in the 21st Century: Trend-Setting and Straggling Behind at the Same Time, Electronic J Comp L, vol 6.4 [Dec. 2002] [a marriage can be contracted by two persons of different sex or of the same sex], available at http://www.ejcl.org/64/art64-5.html [accessed June 2, 2009]).

. In vitro fertilization, unlike artificial insemination, is a medical procedure that requires the assistance of a physician. It is apparently the practice of fertility doctors to require egg donors to surrender their rights to children subsequently born from those eggs, even in situations like Ingrid’s and Mona’s, although there is no legal requirement that they do so. In order to create Sebastian, in accordance with their plan, Mona signed such a surrender, but simultaneously executed a side agreement (of the sort that many attorneys specializing in lesbian, gay, bisexual and transgender work have developed) *569 with Ingrid. In the leading case on genetic versus gestational mothers, the California Supreme Court has held that, since California’s sperm donation statute did not apply, the genetic mother could not waive her parental responsibilities, and her “surrender” was no bar to asserting and having recognized her parental rights (K.M. v E.G., 37 Cal 4th 130, 139, 117 P3d 673, 678-679 [2005]).

. The term “parentage” is used to encompass both the more traditional terms “mother” and “father” in recognition of expansion of the parental relationships now recognized, sanctioned and protected by law (Black’s Law Dictionary [8th ed 2004], parent).

. Whether or not the husband was the biological/genetic parent of the child was unquestioned, and the “strongest presumption known to the law,” that a child born within a marriage is the child of the mother’s husband, has been utilized to protect the husband’s legal rights (see e.g. Michael H. v Gerald D., 491 US 110 [1989]; Deborah L. Forman, Interstate Recognition of Same-Sex Parents in the Wake of Gay Marriage, Civil Unions, and Domestic Partnerships, 46 BC L Rev 1, 47, 81 nn 268, 269 [2004]). The presumption that a child born to a married woman is the child of the woman’s husband is codified in New York in Family Court Act § 516-a (b) and § 532 (a).

. Gestational surrogacy contemplates that the woman who carries and bears the child will relinquish it to another, usually a married couple, generally one or both of whom is genetically related to the child (see e.g. Deborah H. Wald, The Parentage Puzzle: The Interplay between Genetics, Procreative Intent, and Parental Conduct in Determining Legal Parentage, 15 Am U J Gender Soc Pol’y & L 379 [2007]). The controversy created by the eponymous Baby M case (Matter of Baby M, 109 NJ 396, 537 A2d 1227 [1988]) resulted in differing legislative responses, including New York’s, which made surrogacy contracts illegal (Domestic Relations Law § 122).

. The Johnson case famously adopted the “intent” test as a tie-breaker between battling genetic and gestational mothers. The court wrote that the woman “who intended to bring about the birth of a child that she intended to raise as her own” is the natural mother under California law (Johnson, 5 Cal 4th at 93, 851 P2d at 782). That test has since been applied by courts in “a *571 variety of different situations dealing with artificial insemination and surrogacy” (Meghan Anderson, Comment and Casenote, K.M. v E.G.: Blurring the Lines of Parentage in the Modern Courts, 75 U Cin L Rev 275, 286 [2006]).

. (See Perry-Rogers, 276 AD2d at 74 n 1 [“Despite the longstanding tradition that a child cannot have more than one mother and one father at a time, some exceptions to that firm rule have recently begun to develop. For instance, it is now possible for both parties in a lesbian couple to be a child’s mother (pursuant to a second-parent adoption). . . . It is certainly conceivable that under some . . . circumstances (other than presented in the instant case), we would have to treat both genetic and gestational mother as parents, at least for certain purposes” (citation omitted)].)

. Single persons, like married couples, are explicitly included in the statutory language (Domestic Relations Law § 110).

. A statutory exception has heen created by the amendment of Domestic Relations Law § 115-a to expressly authorize readoption proceedings when the child has been previously adopted in a foreign country (Domestic Relations Law § 115-a [8], as added by L 1990, ch 547, § 1). As the Commentaries suggest, “[a] readoption is, in effect, a declaratory judgment that a legal parent-child relationship exists” (Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 115-a, at 202 [1999 ed]).

. The California trial court refused to grant an adoption to a genetic mother in a situation similar to that here. The court ruled that adoption was not available because the entire purpose of the adoption laws is to create a parent-child relationship between two persons who did not previously enjoy that relationship. It recognized that a “natural parent whose parental status has never been judicially terminated, is not capable of adopting his or her own natural child.” (Ryiah Lilith, The G.I.F.T. of Two Biological and Legal Mothers, 9 Am U J Gender Soc Pol’y & L 207, 216 [2001].) Instead, the court issued an order for a new birth certificate amended to reflect the parentage of both mothers (id.). The court apparently was not concerned with issues of “portability” discussed infra.

. “Adoption is the legal proceeding whereby a person takes another person into the relation of child and thereby acquires the rights and incurs the responsibilities of parent in respect of such other person” (Domestic Relations Law § 110 [emphasis added]; see Scheinkman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 110, at 11 [1999 ed]).

. The directive/executive order has been challenged, and its constitutionality has been upheld (Golden v Paterson, 23 Misc 3d 641 [Sup Ct, Bronx County 2008]).

. (See e.g. Moore v Hegeman, 92 NY 521 [1883]; Restatement [Second] of Conflict of Laws § 283 [2]; 52 Am Jur 2d, Marriage § 64.)

. One of the many advantages of the recognition of two parents is a child’s ability to collect Social Security benefits from both (Matter of Jacob, 86 NY2d at 658). Interestingly, the Social Security Act defines a “child” for purposes of determining eligibility for child’s insurance benefits by reference to the inheritance law in the relevant state (42 USC § 416 [h] [2]). Thus, at least while in New York, Sebastian would already be eligible for benefits (Martinez, 50 AD3d 189; Estate of H. Kenneth Ranftle, NYLJ, Feb. 3, 2009, at 27, col 1 [Sur Ct, NY County] [holding partner of deceased validly married in Canada a spouse for purposes of determining distributees entitled to notice]). The Social Security Administration has determined that DOMA does not affect the scope of eligible beneficiaries under the Social Security Act. (See Steven Engel, Deputy Assistant Atty Gen, US Dept of Justice, Office of Legal Counsel, Whether the Defense of Marriage Act Precludes the Non-Biological Child of a Member of a Vermont Civil Union from Qualifying for Child’s Insurance Benefits under the Social Security Act [Oct. 16, 2007], 2007 WL 5254330, 2007 OLC LEXIS 14.)

. In addition, the parties argue that even other New York courts might decline to follow a ruling by this court that Mona is already Sebastian’s parent by virtue of her marriage to Ingrid, citing Matter of Alison D. v Virginia M. (77 NY2d 651 [1991]). The combination of Martinez and the marital presumption together suggest their concern is likely unfounded, although not irrational.

. The most recent tallies of state marriage laws may be found at Human Rights Campaign, Maps of State Laws & Policies, available at http:// www.hrc.org/about_us/state_laws.asp (last updated Nov. 17, 2008).

. (See id. [Alabama (2006), Alaska (1998), Arizona (2008), Arkansas (2004), California (2008), Colorado (2007), Florida (2008), Georgia (2004), Kansas (2005), Idaho (2006), Kentucky (2004), Louisiana (2004), Michigan (2004), Mississippi (2004), Missouri (2004), Montana (2004), Nebraska (2000), Nevada (2002), North Dakota (2004), Ohio (2004), Oklahoma (2004), Oregon (2004) , South Carolina (2006), South Dakota (2006), Tennessee (2006), Texas (2005) , Utah (2004), Virginia (2006) and Wisconsin (2006)].)

. (See id. [in addition to those listed above: Delaware, Hawaii, Illinois, Indiana, Iowa, Maine, Maryland, Minnesota, New Hampshire, North Carolina, Pennsylvania, Vermont, Washington, West Virginia and Wyoming].)

. Recent polls provide a basis for optimism that attitudes concerning same-sex marriage are changing (see Jesse McKinley, A Poll Finds Californians Still Oppose Gay Marriage, New York Times, May 24, 2008, section A, at 16 [while Californians split 46%-45% in opposing gay marriage, “a majority (said) they were not morally offended by it nor did they feel it undercut marriage between members of the opposite sex”]).

. The Full Faith and Credit Clause provides: “Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State” (US Const, art W § !)• There has been an enormous amount of scholarly debate about the effect of the clause on the obligation of states to recognize the validity of marriages contracted in other states (see e.g. Developments in the Law — The Law of Marriage and Family: Constitutional Constraints on Interstate Same-Sex Marriage Recognition, 116 Harv L Rev 2028 [2003]) and the effect and/or constitutionality of DOMA {e.g. Ralph U. Whitten, The Original Understanding of the Full Faith and Credit Clause and the Defense of Marriage Act, 32 Creighton L Rev 255 [1998]). Here, however, the parties were married not in a sister state, but in a foreign country, so the Full Faith and Credit Clause, however construed, offers them no protection.

. That commentator noted, “In an area of deeply divisive moral debate, the [Supreme] Court may hesitate to risk its legitimacy or provoke outrage by adopting a normative baseline at odds with that of a likely supermajority of citizens.” {Developments in the Law, 116 Harv L Rev at 2051.)

. (1 USC § 7, as added by Pub Law 104-199, 110 US Stat 2419.)

. The statute provides:
“No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.” (28 USC § 1738C).

. One exception is a custody case in Virginia, involving the child of a Vermont civil union, in which a Vermont court had already determined that the nongestational, nongenetic partner was the child’s parent. The Virginia Court of Appeals decided the case under the federal Parental Kidnapping Prevention Act (28 USC § 1738A), just before Virginia passed its own state DOMA (Miller-Jenkins v Miller-Jenkins, 49 Va App 88, 637 SE2d 330 [2006]). Denying reargument based on “law of the case,” the Supreme Court of Virginia nevertheless suggested that the case had been wrongly decided (Miller-Jenkins v Miller-Jenkins, 276 Va 19, 28, 661 SE2d 822, 827 [2008]).

. In order to serve the purpose of “reporting requirements [that] yield medically [accurate] facts regarding a live birth” for the Department of Health, the court ordered a first birth certificate showing the gestational mother, with that certificate to be sealed, and a second amended certificate showing the genetic mother (5 Misc 3d at 428-429).

. Under the Full Faith and Credit Clause, a sister state need accord no greater validity to a public record than the issuing home state would do (30 Am Jur 2d, Executions and Enforcement of Judgments § 678).

. The fact that the parties here were legally married in a jurisdiction that permits same-sex marriage, discussed supra, is only tangentially relevant *577 to the gestational/genetic mother issue presented here, insofar as it reinforces the “intent” of the parties, if such intent is relevant or determinative of parentage.

. (See NY Const, art I, § 11; US Const 14th Amend.)

. A leading family law commentator has argued that, in the absence of specific legislation, courts should resolve “new” issues arising from technological advances by reference to settled principles of family law (see Marsha Garrison, Law Making for Baby Making: An Interpretive Approach to the Determination of Legal Parentage, 113 Harv L Rev 835 [2000]; see also Kass v Kass, 91 NY2d at 566).

. While the Family Court Act article dealing with the proceedings understandably used the term “paternity” (since, before ARTs, there was only one mother and there could be no distinction between genetic relationship and procreational sex) the court in a Family Court Act article 5 proceeding issues an order of filiation. Filiation is a gender neutral term connoting “[t]he fact or condition of being a son or daughter; relationship of a child to a parent” (Black’s Law Dictionary [8th ed 2004], filiation). As discussed infra, when necessary to preserve constitutionality, the Family Court Act must be read in a gender neutral manner (see Matter of St. Lawrence County Dept. of Social Servs. v Raymond J.D., 128 Misc 2d 105, 106 [Fam Ct, St. Lawrence County 1985] [indicating substitution of the word “parents” for “father” in support proceeding statute]).

. The Family Court is granted exclusive original jurisdiction over paternity proceedings (Family Ct Act § 511). There are also special provisions *578 relating to establishment of paternity and enforcement of support by social services officials (Family Ct Act § 571), which include a longer period for the commencement of such proceedings (Family Ct Act § 517 [b]).

. Enactment of this simplified procedure was the result of 1975 funding requirements under title iy part D, of the federal Social Security Act (42 USC § 651 et seq.; Social Services Law § 111-a [2]).

. Obviously it is too late for Ingrid and Mona to take advantage of this procedure, even assuming it is available to genetic mothers as well as genetic fathers.

. Public Health Law § 4135-b (1) (a) requires that the acknowledgment, on a form provided by the Department of Health Commissioner, shall be witnessed “by two persons not related to the signatory” after the mother and putative father have been advised of their rights and the consequences (including support obligations) of signing such acknowledgment. Social Services Law § 111-k (1) provides that “[a] social services official or his or her designated representative . . . may obtain” an acknowledgment of paternity, as provided for in Family Court Act § 516-a, or as provided in Public Health Law § 4135-b, with the same formalities. In both cases, the acknowledgment is filed with the registrar of the district in which the birth occurred.

. The same result, legalizing “second parent” or “co-parent” adoptions, has been reached by statute in four states (California, Colorado, Connecticut and Vermont) and by appellate courts in seven states (California, Illinois, Indiana, Massachusetts, New York, New Jersey, Pennsylvania) and the District of Columbia (National Gay and Lesbian Task Force, Second-Parent Adoption Laws Map, http://www.thetaskforce.org/reports_and_research/ second_parent_adoption_laws [last updated Nov. 4, 2008]).

. (Public Health Law § 4138 [1] [c].)

. Culliton involved a gestational surrogacy agreement in which the ova of a married woman, fertilized by the sperm of her husband, were implanted in a gestational surrogate. Distinguishing the situation from earlier cases dealing with paternity controversies, artificial insemination, or genetic surrogacy, Massachusetts’ highest court held that there was no need for an adoption, and that a trial court could, under its general equity powers, grant an order directing that the genetic parents be listed on the babies’ birth certificates.

. The parental rights of unmarried fathers are protected only where the fathers have actually established (or been thwarted in attempting to establish) a relationship with their genetic children (see e.g. Stanley v Illinois, 405 US 645, 650 [1972]), although no such relationship is required for filiation proceedings or a statutorily recognized acknowledgment.

. Paternity procedures apply to «remarried men since, by statute, men married to the mother of their children are already legally presumed to be parents. The (elsewhere) married genetic mother in a lesbian couple should be treated as unmarried for purposes of the paternity laws, inasmuch as she is not permitted to marry in New York.

. Adoptions are complicated and filled with technicalities such that it is critical, if not imperative, to employ a lawyer at considerable cost. Filiation proceedings are considerably easier, and are often pro se, while statutory acknowledgment of paternity does not require, or even contemplate, a lawyer’s assistance. Adoption proceedings are generally lengthy, taking many months, while both paternity procedures are quick and easy. Adoption requires an intrusive (and often expensive) professional “home study” involving intimate details of a couple’s relationship, finances, family and living situation, as well as fingerprinting and a mandatory check for a criminal record and any prior reported child abuse or neglect. There are no such requirements for a finding of paternity.

. The State Equal Protection Clause affords protection “as broad as” that afforded by the Fourteenth Amendment (Brown v State of New York, 89 NY2d 172, 190 [1996]).

. Indeed, the policy of removing potential financial responsibility from the State is so great that New York courts have declared paternity and imposed support requirements on men who, at the time of procreation, were under age and legally incapable of consent (see Mercer County Dept. of Social Servs. v Alf M., 155 Misc 2d 703 [Fam Ct, Queens County 1992]) and men who were allegedly misled by a mother who claimed she was using contraception (Matter of L. Pamela P. v Frank S., 59 NY2d 1 [1983], supra). The history of paternity laws, tracing back to the Elizabethan Poor Law, demonstrates the consistent legislative intent to protect the common fisc from support obligations when a person biologically related to an out-of-wedlock child was available (see Matter of Department of Social Servs. v Thomas J. S., 100 AD2d at 130).

. In this, and many cases where a genetic mother seeks acknowledgment of her parental status in addition to, rather than in opposition to, the gestational mother, same-sex, lesbian relationships are present. In addition to our Court of Appeals recognition that same-sex relationships are “family” relationships (see Braschi v Stahl Assoc. Co., 74 NY2d 201, 211-213 [1989]) that Court has acknowledged that there is no public policy against such relationships (see Hernandez v Robles, 7 NY3d 338, 393 [2006, Kaye, Ch, J., dissenting]).

. Not all men are permitted to seek declarations of their paternity. Men who anonymously donate sperm and sign waivers of parental rights are both protected from claims of support and barred from establishing legal paternity (see Matter of Michael, 166 Misc 2d 973 [Sur Ct, Bronx County 1996]; cf. Domestic Relations Law § 73 [when mother is married]). Likewise, reading that statute in a gender neutral fashion, an anonymous egg donor signing a waiver would be similarly barred. It is only the egg donor who has a relationship with the gestational mother, who intends both to create and raise the child (as evidenced by the side agreement here), and who signs a waiver only because there is no other way to accomplish the in vitro fertilization who can assert parental rights (K.M. v E.G., 37 Cal 4th 130, 117 P3d 673 [2005], supra). Such an egg donor/genetic mother would be read into our statutory paternity proceedings in the same way as a nonanonymous sperm donor who signed no waiver and who established a relationship with the child (see Matter of Thomas S. v Robin Y., 209 AD2d 298 [1st Dept 1994]).

. The legislature has already enacted numerous provisions barring discrimination and enacting penalties for crimes involving animus on the basis of sexual orientation (e.g. Civil Rights Law § 40-c [2]; Executive Law § 296; Education Law § 313; Insurance Law § 2701 [a]; Penal Law § 240.30 [3]; § 485.05 [1]; Public Health Law § 4201).

. Eighteen states have done so (Ryiah Lilith, The G.I.F.T. of Two Biological and Legal Mothers, 9 Am U J Gender Soc Pol’y & L 207, 234 n 189 [2001]), including California, whose highest court drew upon the statutory version to recognize parentage rights in both gestational and genetic mothers (K.M. v E.G., 37 Cal 4th 130, 117 P3d 673 [2005], supra).

. The drafters explained that “it is not believed that cases of this nature will arise frequently” (see UPA [1973] § 21, Comment).

. A man’s parentage can be established by “blood test results ... of the statistical probability of the alleged father’s paternity” (UPA [1973] § 12 [3]).

. “Any interested party may bring an action to determine the existence or nonexistence of a mother and child relationship. Insofar as practicable, the provisions of this Act applicable to the father and child relationship apply” (UPA [1973] § 21).

. This analysis excludes the question of the jurisdiction of this court to grant relief pursuant to any or all of those statutory provisions (see discussion below).

. The Tenth Circuit noted, with regard to adoptions, “[d] espite the fact that courts may use different words, such as ‘decree’ or ‘order,’ to refer to [their] final . . . decisions, it is clear that all such decisions are ‘judgments’ under the common definition” and, “with respect to final judgments entered in a sister state, it is clear there is no ‘public policy’ exception to the Full Faith and Credit Clause” (Finstuen at 1152 n 12, 1153).

. By this statutory provision, Congress legislatively accomplished what the Full Faith and Credit Clause itself would not.

. (Paula Roberts, Center for Law and Social Policy, Voluntary Paternity Acknowledgment: Am Update of State Law, at 1 n 2 [Dec. 11, 2006], available at http://www.clasp.org/publications/voluntary_paternity_update.pdf [accessed June 9, 2009].)

. This assumes that a statutory provision such as Public Health Law § 4135-b (3) (a), purporting to equate an acknowledgment of paternity with the judgment of a court of competent jurisdiction, would require such acknowledgment as a judgment, or judicial proceeding (where sister states have no discretion) rather than a legislative act (where they do). No law has been found on this question.

. Legislative history suggests that this was not the legislature’s intent.